THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
RICHARD A. McFARLAND, Defendant-Appellant.
Fourth District   No. 4—86-0798

Opinion filed October 7, 1987.—Modified on denial of rehearing
October 30, 1987.

Daniel D. Yuhas and Gary R. Peterson, both of State Appellate Defender's Office, of Springfield, for appellant.

Donald D. Bernardi, State's Attorney, of Pontiac (Kenneth R. Boyle, Robert J. Biderman, and Gwendolyn W. Klingler, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GREEN delivered the opinion of the court:

In February 1986 the defendant, Richard A. McFarland, was charged in the circuit court of Livingston County in a 15-count indictment with the offenses of home invasion, residential burglary, armed robbery, aggravated criminal sexual assault, theft over $300, and armed violence. A trial by jury was held and the court directed verdicts on two counts, and the State withdrew one count and nolprossed another count. The jury returned guilty verdicts on all counts submitted to it. On July 31, 1986, after a sentencing hearing, the court entered judgment on the verdicts on counts I (home invasion), III (armed robbery), IV (aggravated criminal sexual assault), and X (armed violence), and sentenced defendant to concurrent terms of 35 years' imprisonment on each count. On November 7, 1986, after hearing on defendant's post-trial motions, the court entered a written order reducing defendant's sentence to concurrent terms of 30 years' imprisonment on each count. Defendant has appealed, contending (1) the trial court erred in denying his motion to suppress his confession and certain physical objects, and (2) he is entitled to resentencing.

All counts against defendant were based on the unlawful entry of defendant and two other men to a rural farmhouse outside Cullom, Illinois, in Livingston County, during the middle of the night on January 10, 1986; the taking of items from the home; and acts committed upon the residents while the perpetrators were inside the residence. The house was located on a lane about 200 feet off the blacktop, with a garage and farm buildings behind it. It was inhabited by a couple, a 29-year-old farmer and his 24-year-old wife, and their 4-month-old daughter.

The evidence adduced at trial showed the couple was awakened by the doorbell at 2:30 a.m., followed by a banging on the front

door. As they looked out the window of their first-floor bedroom, they saw a car sitting just off their garage and a man with his back to them standing by the door to the house. The husband dressed, went out the kitchen door and onto the enclosed porch, and talked to the man, who said he had lost his way. The farmer thought he had pulled the door to the kitchen and into the house shut behind him, but the door had failed to latch. Three men had been in the car which drove up to the house: Michael Holmes, 5 feet 8 inches and 240 pounds; defendant, 5 feet 5 inches and about 125 pounds; and Jerry Uhlhorn, 6 feet and 145 pounds. The three men came to the Cullom area from Missouri in order to burglarize an isolated rural farmhouse. Holmes was from the area and knew the roads. Holmes hit the farmer over the head, which knocked the farmer back through the door and onto the kitchen floor. Defendant entered the home with a rifle and Holmes had a Bowie knife. A 35mm Konica camera was among the items taken from the home.

According to evidence at the suppression hearing, the 35mm Konica camera was recovered from the locked trunk of a car in a consent search on a traffic stop by a St. Louis County, Missouri, police officer on February 5, 1986. When a computer check on the serial numbers of the cameras in the car indicated the Konica camera in the trunk had been reported stolen in a Livingston County burglary, both the driver of the car, who consented to the search, and defendant—the passenger in the car—were arrested for possession of stolen property. At the police station, after being read his *Miranda* rights, defendant confessed to the Livingston County offense, implicated Holmes and Uhlhorn, and made a taped confession and other statements.

At hearing on the motion to suppress, Officer Seymour testified he observed a 1971 Cutlass Oldsmobile southbound in the 1300 block of Lemay in St. Louis County at 2:24 a.m. and noticed the car did not appear to have a front license plate as required by Missouri law. Seymour testified there had been a rash of burglaries on businesses in the area, but he had no immediate report of a burglary. Seymour said when he pulled the 1971 Cutlass over, his sergeant and supervisor also pulled over and asked Seymour why he stopped the car. Seymour testified his sergeant informed him that he had stopped the men in the car the night before at approximately the same time in the same area and had run warrant checks on them then and released them.

Seymour testified the driver of the vehicle identified himself and produced a Missouri driver's license, and the passenger identified

himself as Richard McFarland. Seymour said the driver directed his attention to temporary plates taped to the front and the right-rear windows of his car. Seymour inspected the paper in the rear window to check the registration of the vehicle and, in doing so, observed two expensive-looking cameras, a radio, and a stereo box in the backseat. Seymour said the car occupants had indicated they were from Arnold, Missouri, about five miles away, and said he became suspicious because the driver said they were in Lemay to go to the all-night Steak N Shake restaurant across from where he had stopped the car—and Seymour knew there was an all-night Steak N Shake in Arnold.

Seymour testified after observing the items in the backseat, he asked the driver if he could search the car and look at the items, and the driver consented. Seymour proceeded to obtain the serial numbers from the cameras on the backseat, looked in the stereo box, and inspected under the seat and in the glove box of the car. He then asked the driver for permission to search the trunk, and the driver obtained a screwdriver from inside the car and opened it for the officer. Seymour said he recorded the serial number of a Konica camera in the trunk, asked the driver and passenger to have a seat in the car, and went to his squad car to run the car occupants' names for warrants and run the serial numbers of the cameras. The radio dispatcher informed him several minutes later that the serial number on the camera in the trunk matched one reported taken in a burglary in Livingston County. After obtaining this information, Seymour went back to the car and placed both individuals under arrest for possession of stolen property and seized items from the car and took them in his vehicle to the station. Seymour transported the car's driver to the station and another officer transported defendant.

According to Seymour, he spoke first to the car driver and then to defendant. He interviewed defendant at about 5 a.m., at which time defendant waived his *Miranda* rights. Seymour told defendant the Konica camera in the trunk of the car had been stolen in a burglary in northern Illinois, and information he had gained led him to believe the offenses committed were more serious than burglary. Seymour said defendant first stated he had bought the camera from an individual named Tom who lived in the Arnold area. After a very short time, defendant told Seymour he had lied about purchasing the camera; and he in fact had been involved with two other individuals, whom he named, and had taken the camera out of the house in a robbery-type situation in northern Illinois. Seymour said he took a

very brief verbal statement and asked defendant if he would be willing to give a taped statement, and defendant said he would and that he fully understood the seriousness of the charges. After several more telephone calls between law-enforcement personnel in Livingston County and Officer Seymour, Seymour obtained tapes and a recording device and took defendant's taped statement at a second interview at about 7 a.m.

On this evidence, the trial judge denied defendant's motion to suppress, concluding (1) the officer had probable cause to stop the car for a traffic violation; (2) given the circumstances, the officer had grounds to make a visual search from the exterior of the car with his flashlight; (3) on observation of two 35mm cameras lying on the backseat of the car, the officer had probable cause to search the interior of the car; (4) the car operator consented to a search of the interior of the car and the trunk; (5) in conducting the consent search, the officer had a legitimate right to search the trunk and observe the serial number on a 35mm camera found there; (6) after receiving information from reliable police sources that the camera in the trunk had been reported stolen, the officer had a right to seize the camera on the grounds that it represented stolen goods, and he had reasonable grounds to believe the car occupants had committed an offense and to arrest them; (7) defendant, a passenger in the car, had no interest in the trunk of the car, and the consent search infringed no interest the fourth amendment was designed to protect; and (8) the statement made by the defendant was voluntary. The court's written order concluded:

> "[I]f the conduct of the police violated the defendant's Fourth Amendment rights, it was inadvertent and did not rise to the level of conscious or flagrant misconduct requiring prophylactic exclusion of the defendant's statement because the voluntariness of the statement, examined in the totality of the circumstances present in this case, shows that the seizure preceded the taking of the statement by five hours in the case of the first statement and more than eight hours in the case of the second, and there was no evidence to show that the statements were [affected] by the illegality in the initial detention. *Rawlings v. Kentucky* 448 U.S. 98, 65 L. Ed. 2d 633, 100 S. Ct. 2556 (1980)."

Defendant contends his confession should have been suppressed because it was the result of an illegal arrest made without probable cause.

We conclude we need not decide the issue of whether there

was probable cause to arrest defendant in this case because the trial court nevertheless found the confession was free and voluntary. Under the standard enunciated in *Brown v. Illinois* (1975), 411 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254, and reaffirmed in *Rawlings v. Kentucky* (1980), 448 U.S. 98, 106-07, 65 L. Ed. 2d 633, 643, 100 S. Ct. 2556, 2562, even if the arrest is illegal under the fourth amendment, a subsequent statement by a defendant may meet the fifth amendment standard of voluntariness if it is the product of a free will.

■ As stated in *Rawlings*, the question of whether a confession is the product of a free will *must be answered on the facts of each case and no single fact is dispositive. Rawlings* referred to such facts as (1) whether *Miranda* warnings were given, (2) the temporal proximity of the arrest and the confession, (3) the presence of intervening circumstances, and (4) particularly, the purpose and flagrancy of the official misconduct involved in the illegal detention. The voluntariness of the statement is a threshold requirement, and the burden of showing admissibility rests on the prosecution.

Here, the trial court applied this standard and found the defendant's statements while in detention after the arrest were voluntary. Defendant concedes he was given *Miranda* warnings, but argues such warnings alone are insufficient to attenuate the taint of an illegal arrest. (*Brown v. Illinois* (1975), 442 U.S. 590, 602, 45 L. Ed. 2d 416, 426, 95 S. Ct. 2254, 2261; *People v. Hardy* (1986), 142 Ill. App. 3d 108, 118, 491 N.E.2d 493, 501.) He argues (1) the confession was within hours of the arrest; (2) there was no intervening event of any significance; and (3) the arrest without probable cause had a "quality of purposefulness" and was "an expedition for evidence." We disagree.

■ In this case, assuming *arguendo* there was not probable cause to arrest defendant and he was illegally detained, we agree with the trial court that the totality of the circumstances shows the police conduct here was not such as to deprive the defendant's statements of voluntariness as the product of a free will. Defendant had *Miranda* warnings. The temporal proximity of the arrest and the confession were not such as to require the conclusion that the confession was not voluntary.

In addition, we believe intervening circumstances did exist. First, the record contains evidence the car's driver told the arresting officer the camera in the trunk did not belong to him, but the items in the backseat of the car were his. Since defendant had loaned the Konica camera to the car driver that day, he knew the

car driver could tie the stolen camera to him. Second, the defendant was confronted with *untainted evidence, i.e.,* the 35mm Konica camera, recovered from the trunk of the car with the consent of the driver and owner of the vehicle.

The facts here are distinguishable from those recently addressed by our supreme court in *People v. White* (1987), 117 Ill. 2d 194, wherein a codefendant's presence at the police station was rejected as an intervening circumstance. There the record did not present any suggestion the defendant believed or knew his codefendant had implicated him in the crime and, therefore, the codefendant's presence in an interrogation room next to that of defendant was deemed inherently ambiguous. Under *White*, a defendant's confrontation with untainted evidence, which induces in the defendant a voluntary desire to confess, may be a legitimate intervening circumstance. So, in the case of *In re R.S.* (1981), 93 Ill. App. 3d 941, 946-47, 418 N.E.2d 195, 199-200, referred to in *White*, the defendant was confronted with a stolen clock seized pursuant to a valid search warrant unrelated to the defendant's illegal arrest. *White* referred to this as obviously untainted evidence capable of inducing a voluntary desire to confess.

In considering the official misconduct prong of *Rawlings* and *Brown*, we conclude that any such misconduct here would have arisen from the arrest of defendant by a Missouri police officer without probable cause. This would have resulted from the officer's incorrectly assuming that probable cause could be inferred from defendant's presence in the vehicle, the trunk of which contained a camera which the officer had probable cause to believe stolen. The evidence clearly supports a determination the stop of the vehicle was proper and the search consensual. Thus, any impropriety in the arrest was lacking in flagrancy and without improper purpose.

It is well settled that a reviewing court will not disturb a trial court's finding on a motion to suppress, unless that finding is manifestly erroneous. (*People v. Tisler* (1984), 103 Ill. 2d 226, 248, 469 N.E.2d 147, 158, citing *People v. Reynolds* (1983), 94 Ill. 2d 160, 165, 445 N.E.2d 766, 769; *People v. Haskell* (1968), 41 Ill. 2d 25, 30, 241 N.E.2d 430, 433.) We conclude the trial court's determination on the issue of the voluntariness of defendant's confession and statement is supported by the evidence and, therefore, we find no basis to disturb its ruling on the motion to suppress.

■ Defendant next argues he is entitled to resentencing since, first, the trial judge was laboring under an erroneous impression that the minimum allowable sentence for each of the offenses was

30 years' imprisonment, rather than the 6-year term authorized by statute; and, second, the trial court erred in concluding the extended-term provision of the Unified Code of Corrections (Code) (Ill. Rev. Stat. 1985, ch. 38, pars. 1005—8—2, 1005—5—3.2(b)) applied to this case. The offenses charged in the counts on which the court entered judgment, *i.e.*, home invasion, armed robbery, aggravated criminal sexual assault, and armed violence (Ill. Rev. Stat. 1985, ch. 38, pars. 12—11(a)(2), 18—2(a), 12—14(a)(1), 33A—2), are all Class X felonies (Ill. Rev. Stat. 1985, ch. 38, pars. 12—11(b), 18—2(b), 12—14(c), 33A—3 (referring to 33A—1(b))). The sentencing range for Class X felonies under the Code is "not less than 6 years and not more than 30 years." (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(3).) If, however, the sentencing court finds one or more factors in aggravation as set forth in section 5—5—3.2(b) of the Code (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b)) applicable, the judge may sentence the offender under the extended-term provision of the Code. For Class X felonies, the extended-term provision provides for a sentence of imprisonment of "not less than 30 years and not more than 60 years." (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—2(a)(2).) Before reversing a sentence imposed by the trial court, it must be clearly evident that the sentence was improperly imposed. In making that determination, the reviewing court should not focus on a few words or statements of the trial court, but must consider the entire record as a whole (*People v. Ward* (1986), 113 Ill. 2d 516, 526-27, 499 N.E.2d 422, 425-26 (and cases cited therein)), including arguments of counsel (*People v. Young* (1985), 138 Ill. App. 3d 130, 142, 485 N.E.2d 443, 450 (and cases cited therein)).

At the sentencing hearing, the prosecutor argued the circumstances of the offenses made the defendant eligible for extended-term sentencing due to the heinous nature of the crimes committed and recommended 35-year sentences of imprisonment. Defendant presented medical testimony in which a doctor testified defendant's rehabilitation would take approximately six to eight years. Defense counsel acknowledged the offenses of which defendant stood convicted were heinous in nature, but argued mitigating circumstances should be considered and the six-year minimum term of imprisonment should be imposed on defendant. Based on the evidence presented by defendant at the hearing and defense counsel's argument, we reject defendant's claim that the trial court in imposing sentence was not aware that a six-year term of imprisonment was the minimum allowable sentence for the offenses. Rather, we conclude the court intended to sentence defendant to extended terms for which

the minimum sentence would be 30 years.

Defendant also argues, for the first time on appeal, that the trial judge erred by concluding the extended-term provision of the Code applied. Defendant now complains that at sentencing the judge found the crimes "heinous," whereas the extended-term provision applies only if the crimes are *"exceptionally* brutal or heinous" (emphasis added) (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b)(2)), citing numerous cases as illustrative of fact situations previously viewed as sufficiently brutal and heinous to warrant sentencing under this subsection.

The judge did not *specifically* state at the sentencing hearing that he was imposing an extended-term sentence, nor did he specifically identify *by statutory citation* any factors in aggravation under section 5—5—3.2(b) of the Code. Nevertheless, we conclude the judge's remarks at sentencing sufficiently indicated the factors he regarded as supporting imposition of concurrent terms of 35 years' imprisonment, clearly extended-term sentences; and neither defense counsel nor defendant requested greater specificity in the court's reasoning at that time. The disparity between the sentences imposed on defendant, as compared to those imposed on the codefendants under plea agreements, was the basis of defendant's motion to reduce sentence and the court's subsequent order reducing defendant's sentences to concurrent terms of 30 years' imprisonment on each of the four counts.

■ We reject defendant's argument. According to the testimony adduced at trial, defendant and his companions were in the victims' home for an hour and a half. As defendant entered the house with a rifle, codefendant Holmes hit the farmer over the head, a blow which required stitches to close, and the farmer was thereafter tied up, kept in the living room on his stomach with his hands tied behind his back, and repeatedly threatened. His wife was struck in the face with sufficient force to cut her lip and give her a black eye, was tied up on the bed and forced to perform oral sex on defendant and a codefendant, was thereafter left tied in a closet. According to her testimony at trial, after defendant took her to the bedroom and tied hands behind her back with her bra, he asked her whether her husband and she had ever had anal intercourse and she told him they had not. She testified the "small man" (clearly the defendant) then referred to her as a virgin, leaned his rifle against the wall about five feet from the bed, unzipped his pants, and required her to perform fellatio on him, ejaculating into her mouth. While the "small man" had left the bedroom, one of the codefendants came

into the bedroom and ordered her to perform oral sex on him. He began rubbing a Bowie knife he was carrying against her thighs and she jumped up. The codefendant threw her back down on the bed, put his head between her legs, and took out his penis and stuck it in her mouth. After an unspecified time, but before the large man ejaculated, the "small man" came back into the bedroom and told him there was no time, and the "bigger man" (clearly Holmes) got up and left the room. The "small man" then ordered her into the closet; and the men continued ransacking the house, coming back and checking to see that she was in the closet and asking her where property was from outside the closet door. During the hour and a half episode, both according to the wife's testimony and defendant's taped confession, the wife cried and begged for the lives of her husband and her 4-month-old daughter, who lay in a crib in the corner of the front room—neither of whom she could see from the bedroom.

According to the presentence investigation report and evidence presented at the sentencing hearing, the victims of the offense and their infant daughter resided with the wife's parents for several months after the offense. The two-story wood frame home in which they had been living was the farmer's grandmother's home and had great sentimental value to the couple, but the upstairs of the residence had to be remodeled and various security devices installed in the house and driveway before they could return to live in it. The first-floor bedroom had to be converted to another use, since the wife could no longer bear to sleep in it. A driveway alarm system was installed so they could tell when a car came into the yard; new locks were put on all the doors; locks were put on the windows, and boards were also put in the windows to keep them from opening; and the farmer bought a gun and got a dog. The wife lost wages for a period estimated between two and four weeks, took medication for three months to assist her in sleeping, and attended five or six counseling sessions in the two months following the incident. The husband also had trouble sleeping at night, but was prohibited from taking any medication because of the head injury inflicted on him in the incident.

At the sentencing hearing, the judge stated the commission of the offense was primarily induced by this defendant and was facilitated by Holmes and Uhlhorn; and that defendant had caused damages, losses, and injuries such as to tear at "the fabric of which civilization is made."

In pronouncing sentence, the judge stated:

"Frankly, the conclusion that I came to was in excess of the recommendation of the State's Attorney in this case. But I think that we are in the same range, and I am, therefore, going to follow the recommendation of the State's Attorney and sentence the defendant to a term of 35 years imprisonment ***."

Defense counsel subsequently filed a motion to vacate the sentencing order and reduce the sentences imposed on defendant, arguing there was a sentencing disparity shown between the sentences imposed on defendant and those imposed on codefendants Holmes (20 years' imprisonment) and Uhlhorn (28 years' imprisonment) based on plea agreements. Defendant maintained since he had been offered a 20-year plea agreement, the sentences imposed after jury trial showed he was being punished for exercising his constitutional right to trial. After hearing on defendant's post-trial motions, the trial judge entered a written order which stated in pertinent part:

"Though it was not the intention of this court to punish the defendant with a longer sentence merely because he exercised his constitutional right to be tried before an impartial jury, it is, nevertheless true that the other two defendants negotiated with the State's Attorney for lesser sentences. *Both Mr. Holmes and Mr. Uhlhorn pleaded guilty and were sentenced in accordance with the State's Attorney's recommendation before this court had the opportunity to hear all of the evidence at a full-blown trial.* Based upon the factual basis for the plea of guilty of Mr. Holmes and Mr. Uhlhorn, the court believed at the time of sentencing Mr. Holmes and Mr. Uhlhorn that the sentences imposed upon them were commensurate with their past records of criminal convictions and their respective opportunities for rehabilitation.

Hearing the evidence at the trial of [defendant] persuaded this court that the nature of these crimes was a good deal more serious than it had previously believed based upon the factual basis for the pleas of guilty of Mr. Holmes and Mr. Uhlhorn. Based upon the factors in mitigation set forth in paragraph 1005—5—3.1 of the Unified Code of Corrections, and based upon the factors in [aggravation] set forth in paragraph 1005—5—3.2 of the Unified Code of Corrections, *this court believes that a 35 year sentence for the defendant McFarland is totally justified based upon the serious harm caused by the defendant's conduct and the exceptionally brutal and heinous behavior indicative of wanton cruelty toward*

[*the victims*], and the necessity of deterring others from committing like acts of criminal conduct against unprotected householders in rural areas far from the protection of any police agency or other means of obtaining help. *The court also notes* that the *defendant was convicted of aggravated criminal sexual assault committed on the same victim by one or more individuals* and that the defendant had knowledge of the participation of [codefendants] in that crime and the commission of it was part of a single course of conduct during which there was no substantial change in the nature of the criminal objective. S.H.A. Chapter 38, Paragraph 1005—5—3.2(b)(4)." (Emphasis added.)

In concluding the order, the court reduced defendant's sentences to concurrent terms of 30 years' imprisonment on each of the four counts.

Since all of the crimes on which judgments were entered against defendant were within the same class, *i.e.*, Class X felonies, the trial court could properly impose extended-term sentences for each of those offenses. (Compare *People v. Jordan* (1984), 103 Ill. 2d 192, 207, 469 N.E.2d 569, 576 (discussing propriety of sentences imposed on defendants Woods and Sparkman).) The trial court ruled that the offenses on which judgment was entered involved exceptionally brutal and heinous behavior indicative of wanton cruelty (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b)(2)); and further indicated, as to the aggravated criminal sexual assault conviction, such a sentence was also supported by another aggravating factor, the involvement of more than one defendant (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b)(4)). As the precedential scope of a decision is limited to the facts before the court (*People v. Flatt* (1980), 82 Ill. 2d 250, 261, 412 N.E.2d 509, 515), the facts of the cases cited by defendant on appeal cannot be interpreted as restricting the scope of conduct which a sentencing judge may find within the aggravating factors set forth in section 5—5—3.2(b) of the Code—a determination which must necessarily be made by the sentencing court on a case-by-case basis.

We find no abuse of discretion in the sentences imposed here and, therefore, we conclude defendant is not entitled to resentencing.

Affirmed.

LUND and KNECHT, JJ., concur.