THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DANNY TRAVIS, a/k/a O'Daniel Travis, Defendant-Appellant.

Fourth District No. 4—87—0289

Opinion filed June 21, 1988.—Rehearing denied July 19, 1988.

874

Daniel D. Yuhas and Richard D. Frazier, both of State Appellate Defender's Office, of Springfield, for appellant.

Jeffrey K. Davison, State's Attorney, of Decatur (Kenneth R. Boyle, Robert J. Biderman, and Denise M. Ambrose, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LUND delivered the opinion of the court:

On February 24, 1987, defendant Danny Travis was found guilty by a jury in the circuit court of Macon County of the offenses of murder, home invasion, residential burglary, and aggravated criminal sexual assault in violation of sections 9—1, 12—11, 19—3, and 12—14, respectively, of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1, 12—11, 19—3, 12—14). Defendant subsequently received a prison sentence of natural life on the murder conviction, 60 years' imprisonment for home invasion, 60 years' imprisonment for aggravated criminal sexual assault, and 30 years' imprisonment for burglary, with all sentences to be served concurrently. Defendant appeals, alleging (1) various statements he made were improperly allowed into evidence; (2) the court erred in refusing to dismiss a juror; (3) the jury instructions deprived him of his right to a unanimous verdict; and (4) all the convictions but the murder conviction must be vacated. We affirm and modify.

On Wednesday, October 30, 1985, D.H., age 66, was found dead in her home. The assailants gained entry by breaking out a basement window and crawling into the house. They exited by the back door, which was found ajar. The premises were deteriorated, with peeling wallpaper, and full of boxes, papers, and refuse. The telephone had been pulled off the wall.

D.H. was found lying face up on the living room floor on several blankets. A bloodstained rubber mallet lay about one foot from her head. The two blouses she wore were torn open, and her brassiere was pushed over her breasts. She was naked below her waist. Her ankles and right wrist were separately bound with pieces of cloth, but these bindings were not tied to anything. Her left hand was bruised and bloodstained, and blood was smeared on her stomach. A bloodstained two-cell Ray-O-Vac flashlight was found at her feet. A pair of panties and men's pajamas were laying at her feet. A semen stain was found on the bedspread she was lying on.

The autopsy revealed she had died from manual strangulation. She also sustained considerable head injuries and lacerations to her face and lips. The shape of the mallet corresponded with injuries to her head. There were also multiple injuries to her vagina. It appeared as if something had been thrust into her vagina causing tearing. It was impossible to tell if the vaginal injuries were pre- or post-mortem. Her left hand had numerous injuries consistent with a defensive effort on her part to ward off blows of some type.

Nobody was arrested at that time, and the case was left open by the Decatur police.

At 9:30 p.m. on Thursday, September 25, 1986, Detective Brian Bell of the Decatur police department went looking for defendant to interview him concerning the murder of Gregory Taylor. He was acting upon information that had been received that defendant admitted involvement in the Taylor crime to others. Upon finding him, Bell placed defendant under arrest for the murder and took him to the Decatur police department jail. At 9:50 p.m., defendant was interviewed and, eventually, made an inculpatory statement concerning the Taylor offense, which was tape-recorded, with the interview concluding at 11:55 p.m.

At 8:05 a.m. on the following morning, defendant was again questioned about the crime. Defendant then took the officers to a location in Decatur involved with the crime and was returned to his cell around 9:45 a.m.

At 7:45 p.m. on that day, Friday, September 26, defendant was again interviewed. He changed his story and implicated a friend, J. R. Wilson, as a codefendant. Defendant then volunteered that he and Wilson had killed an old lady near Garfield school. D.H.'s house was near Garfield school.

Defendant stated that Wilson approached him about breaking into the old lady's house. They drove by the house a few times until the lights went out. They then parked in the alley behind the house. Wilson went to the house and kicked in the basement window, gaining entry. He then opened the back door letting defendant in. As they entered the house, D.H. got up from the couch in the living room, and Wilson knocked her down.

Defendant stated he then went to the back bedroom and collected some silverware, jewelry, and $600 in cash. At this time, defendant was wearing plastic gloves. Defendant reentered the house and saw Wilson take a ring off D.H.'s finger, tear her nightgown, and rape her. Wilson also struck her several more times about the head. Defendant stated he was carrying a flashlight and remembers the house had peeling wallpaper.

After giving this statement, defendant was taken to a police car and directed the officers to the scene of the crime. He also gave a description of the interior and how access to the house was gained. They returned to the police department, and defendant gave a tape-recorded statement concerning both crimes. Defendant was then taken to a polygraph examiner. As he left the examiner around 12:30 a.m., defendant volunteered to the police that he had shoved a flashlight into D.H.'s vagina.

On Saturday, September 27, defendant was only disturbed for pur-

poses of having hair samples taken and to be shown some spoons similar to those taken from D.H.'s house.

On Sunday, September 28, defendant identified a flashlight similar to the one he used on D.H. He maintained he only did this after Wilson had killed her. Defendant also gave a blood sample.

At 4:05 p.m. on Monday, defendant was questioned some more concerning the Taylor murder. At 4:15 p.m., he was taken for more polygraph examinations. Upon leaving the examiner, defendant volunteered that he wanted to tell the truth and that he killed D.H. by himself. Defendant's last interview occurred at 8:40 p.m. that evening. The next day, an information was filed, and defendant appeared in court.

Defendant subsequently filed a motion to suppress his confession. It asserted the confession should be suppressed since defendant was not taken without unnecessary delay before a judicial officer. The motion also alleged that the statements stemmed from an unknowing and involuntary waiver of his rights due to defendant's subnormal intelligence and the fact he was intoxicated, deprived of sleep, and threatened by the police. A hearing was conducted on December 9, 1986.

Detective Brian Bell testified he arrested defendant on September 25 for the Taylor murder. Defendant was taken to the interview room at the police station by Officer Rick Jones and Bell around 9:50 p.m. Bell gave defendant a custodial interview advice form which contained the *Miranda* warnings and asked him to read along as Bell read it out loud. Defendant pushed the form away and stated he would not, saying he was not going to sign anything. Bell then verbally admonished defendant of his rights which defendant stated he understood. Bell then gave defendant the form explaining it contained the warnings just given. They then read the form, and defendant signed it, acknowledging he understood these rights. Defendant at no time indicated he did not understand, nor did he appear confused. Defendant later advised he could not read and write. Defendant gave a taped statement concerning the Taylor murder. This tape contained an admonishment of defendant and his waiver. Defendant was allowed to drink from a water fountain and was given a Coke and a sandwich. Bell observed a slight odor of alcohol on defendant's breath, but it was his opinion that defendant was not intoxicated.

The next day, at 7:45 p.m., Bell reinterviewed defendant. At that time, Sergeant Robert Pittenger was present with them. Defendant was again advised of his *Miranda* rights and signed a waiver of such. During the interview, defendant made the first comment about the

D.H. murder. Defendant then took them to the murder site. Defendant was interviewed again at 10 p.m. with Jones also present. Defendant gave a taped statement for each offense which contained another admonishment and waiver. Defendant was then taken to the polygraph examiner by Bell and Jones.

On Monday, September 29, around 4:15 p.m., Bell and Jones took defendant back to the polygraph examiner. Upon leaving there, defendant volunteered his statement to Bell. At the station, Bell again admonished defendant concerning his rights, which he waived.

Mark Cheviron works as a polygraph examiner. He tested defendant twice. Each time, he advised defendant of his *Miranda* rights, which were waived. He also advised him he did not have to take the test. Defendant's only comment either time was that he did not understand why he had to take the test a second time. When told that Cheviron wanted to retest him on some of the previous statements, defendant made no other comment.

Sergeant Don Brooks is currently supervisor of the day shift. He was present with Bell and Jones when defendant gave his first taped statement. He observed defendant being admonished and waiving his rights. He inquired of defendant if he was hungry and then sent someone out for a sandwich for defendant. He also noticed an odor of alcohol about defendant but opined he was not intoxicated.

Detective Robert Pittenger has been with the police force 16 years. On Friday night, he was with Bell when he interviewed defendant. He witnessed defendant being advised of his rights and waiving same.

Francis Schultz has been employed by the police for 17 years. He transported defendant and Detective George Lebo to a site in Decatur on the morning of the 26th. It was his opinion that defendant was not intoxicated at that time.

Detective Robert Davis first had contact with defendant on the 27th when he took some hair specimens. Davis later interviewed defendant on the 29th around 1 p.m. He advised defendant of his rights, and defendant, stating he understood, waived them.

Detective Rick Jones was present for the interview on September 25. He witnessed defendant being advised of his rights, which defendant acknowledged and waived. During this interview, he was given a soda and a sandwich. He spent two hours in defendant's presence, and, while he noticed a faint smell of alcohol, did not believe he was intoxicated.

On the 26th, he and Bell took defendant out in a car, and defendant directed them to the murder site. Then two taped statements of

defendant were taken where defendant again waived his rights. He and Bell then took defendant to the polygraph examiner. As they left, defendant told Jones about using the flashlight.

Jones saw defendant on the 28th when he showed him a flashlight and photo lineup. He helped Bell transport defendant on the 29th to the polygraph examiner.

Detective George Lebo interviewed defendant on the 26th around 8 a.m. He advised him of his rights, and defendant, saying he understood, then signed a written wavier. He interviewed defendant about the Taylor murder and then transported him with Officer Schultz to a site in Decatur. It was his opinion defendant was not intoxicated at that time.

All the police testified defendant was not subject to coercion or deprived of any of the necessities of life. Defendant never claimed to be tired; nor did he tell them he did not understand his rights, he wanted to remain silent, or he wanted an attorney.

Dr. Stephen Courtois, a State-licensed psychologist, testified he examined defendant to determine if defendant was able to stand trial. He gave defendant the language portion of the Wechsler Adult Intelligence Scale Revised Test and a quick screening IQ test. The result was 64, which classifies defendant as mildly mentally retarded. Defendant scored a three on the language test, which is very low and would be comparable to a 10- to 12-year-old. This test measures his ability to understand instructions and express himself.

Courtois observed that defendant is conversant with the legal process. It was his opinion, after reviewing a custodial interview advice form, that if someone had read it to defendant, defendant would understand those rights. He based this on his observation that since defendant had gone through other court proceedings, he has developed and exhibited an understanding of the language used in that environment.

Defendant testified that on September 25, he had consumed two-fifths of gin since 6 a.m. All he remembers at the station is telling the police he wanted to go to sleep, but they kept harassing him. He does not remember much else because he was drunk. He also asked for a lawyer, but was told he would get one when he went to court. He does not remember speaking with anyone on Friday. He remembers speaking with someone on Saturday, but he does not remember the content. All he knows is that every time he attempted to go to sleep, the police awakened him. Defendant completed the ninth grade in special education. He cannot read or write. He remembers signing a form he could not read, and the police did not read it to him.

The State introduced authenticated copies of defendant's earlier convictions for burglary and aggravated battery for impeachment purposes. The court listened to the taped confessions. The court then denied defendant's motion.

On February 17, the jury, comprised of 12 regular and 2 alternate jurors, was selected. Due to a scheduling problem with a witness, the trial was set to start on February 23. The court instructed the jury not to read any newspaper accounts or listen to any radio or television accounts of this offense.

On February 23, defendant brought to the court's attention that a radio broadcast that morning indicated defendant was going to trial on the first of two murder charges. Two jurors indicated they heard the broadcast. One juror did not hear the whole broadcast. The other, indicating he heard the entire thing, was questioned, and was allowed to remain on the jury over defendant's motion to have him removed.

The trial commenced with testimony concerning finding D.H.'s body and a description of the crime scene and what was found. Deputy Police Chief Joseph Meyers testified he was in charge of what information was to be released concerning the crime. He stated none of the details of the offense were released to the press though he did acknowledge a newspaper article suggested D.H. had been sexually assaulted. Dr. Grant Johnson, a pathologist, testified concerning the injuries and cause of death. Bell and Jones testified concerning defendant's confession and incriminating statements, as well as the fact defendant was able to take them to the crime scene. The State rested.

Defendant presented evidence that the fingerprints of himself and Wilson were not found on the telephone recovered at the scene. The evidence also established that the hair found at the scene could not have come from them and that the semen stain did not come from them.

At the jury instruction conference, the State presented an issue instruction for murder which included the accountability language. Defendant objected, but the court gave it. The jury returned a guilty verdict on all the offenses.

On February 26, the jury found defendant qualified for the death penalty, but was unable to unanimously agree that there were no mitigating factors sufficient to preclude imposition of the death penalty. Sentencing was, accordingly, continued to March 30, 1987. The court found the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty and sentenced defendant to a term of natural-life imprisonment. The court also found this conduct

qualified defendant for an extended-term sentence on the other convictions, and sentenced him to 60 years' imprisonment on the aggravated criminal sexual assault and home invasion offenses, and 30 years' imprisonment on the residential burglary offense, with all four sentences to be served concurrently. This appeal followed.

Defendant raises three arguments concerning admission of his statements to the police. He first asserts he expressed a desire to remain silent the first time he was interviewed, but the police continued to interrogate him. He argues this taints all of his subsequent statements. We disagree.

■ A statement made by a suspect as a result of a custodial interrogation is admissible if, after being advised of his *Miranda* rights, including the right to remain silent, he voluntarily waives his rights prior to making the statement. (*Miranda v. Arizona* (1966), 384 U.S. 436, 444-45, 16 L. Ed. 2d 694, 707, 86 S. Ct. 1602, 1612; *People v. R.C.* (1985), 108 Ill. 2d 349, 353, 483 N.E.2d 1241, 1243.) However, even if a suspect initially waives his rights, the interrogation must cease if he indicates "in any manner" prior to or during questioning that he wishes to remain silent. (*Miranda*, 384 U.S. at 444-45, 16 L. Ed. 2d at 707, 86 S. Ct. at 1612; *R.C.*, 108 Ill. 2d at 353, 483 N.E.2d at 1243.) Under these circumstances, the interrogation may be resumed, and any statement resulting from renewed questioning is admissible only if the suspect's right to remain silent was "scrupulously honored." *Michigan v. Mosley* (1975), 423 U.S. 96, 104, 46 L. Ed. 2d 313, 321, 96 S. Ct. 321, 326; *R.C.*, 108 Ill. 2d at 353, 483 N.E.2d at 1243.

Defendant asserts his conduct in throwing the written interview form to the floor and stating he would not sign anything is an indication "in any manner" that he wished to remain silent. He further argues that Bell, by proceeding immediately to advise him of his rights and continuing the interview, did not "scrupulously honor" this desire.

■ Preliminarily, we note this was not one of the grounds contained in the motion to suppress. Our supreme court has determined that if specific objections to the admission of evidence are raised at the trial court, all other objections to admission of that evidence are waived if they are not made to the court or contained in the post-trial motion. (*People v. Curry* (1973), 56 Ill. 2d 162, 170, 306 N.E.2d 292, 296.) Accordingly, this alleged error is waived.

■ However, even if the merits of the argument are addressed, it is apparent defendant's argument must fail because it rests on a faulty premise. We do not find defendant's conduct in pushing away

the written form to be such as evidences a desire to remain silent. Defendant cites no cases in support of his position. To the contrary, it is settled that a failure to sign a waiver form by itself does not establish that defendant wished to stop the interrogation. (*People v. Downey* (1987), 162 Ill. App. 3d 322, 337, 515 N.E.2d 362, 371; *People v. West* (1975), 25 Ill. App. 3d 827, 832, 322 N.E.2d 587, 591; *People v. Starnes* (1972), 8 Ill. App. 3d 709, 713, 289 N.E.2d 264, 267.) In the present case, it is clear defendant pushed the form away because, due to his illiteracy, he did not know its contents. Once Bell explained it to him, defendant agreed to sign the document and waive his rights. There was no desire to remain silent.

 Defendant next contends the court erred by finding the statements were voluntarily given and not suppressing them. The fundamental principle governing the admission of confessions is that the confession must be voluntary. (*People v. Berry* (1984), 123 Ill. App. 3d 1042, 1044, 463 N.E.2d 1044, 1047.) Whether a statement is voluntarily given depends on the totality of the circumstances. (*People v. Prim* (1972), 53 Ill. 2d 62, 70, 289 N.E.2d 601, 606, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731.) The test is whether it has been freely and voluntarily made without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he confessed. (*Prim*, 53 Ill. 2d at 70, 289 N.E.2d at 606; *People v. Hester* (1968), 39 Ill. 2d 489, 497, 237 N.E.2d 466, 472-73.) Defendant's age, education, mental capacity, emotional characteristics, and experience in criminal matters are among the factors which must be considered in determining the voluntariness of a confession. (*Hester*, 39 Ill. 2d at 497, 237 N.E.2d at 473; *Berry*, 123 Ill. App. 3d at 1044, 463 N.E.2d at 1047.) A trial court's finding that a defendant voluntarily waived his rights need not be proved beyond a reasonable doubt, and such a finding will only be overturned if it is against the manifest weight of the evidence. *Prim*, 53 Ill. 2d at 70, 289 N.E.2d at 606; *People v. Creamer* (1986), 143 Ill. App. 3d 64, 70, 492 N.E.2d 923, 928.

██ Defendant mainly relies on his subnormal intelligence and the fact he was in custody for four days prior to being brought to court to support his argument. He notes section 109—1 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 109—1) provides that a person arrested without a warrant is to be brought before a judge without unnecessary delay. He asserts the delay in not bringing him to court until Tuesday is in violation of this section. Accordingly, he relies on cases involving statements given after an illegal arrest which include facts such as (1) whether *Miranda* warnings

were given, (2) the temporal proximity of the arrest and the confession, (3) the presence of intervening circumstances, and (4) particularly, the purpose and flagrancy of the official misconduct involved in the illegal detention in determining the voluntariness and admissibility of a statement. See *Brown v. Illinois* (1975), 422 U.S. 590, 603-04, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261-62; *People v. Franklin* (1987), 115 Ill. 2d 328, 333, 504 N.E.2d 80, 82; *People v. McFarland* (1987), 161 Ill. App. 3d 163, 168, 514 N.E.2d 72, 75.

Defendant's argument fails for two reasons. First, the present case does not involve an illegal arrest. Defendant filed a motion alleging such, which was denied, and which he did not appeal. Defendant was under a valid arrest for the Taylor murder. These cases are inapplicable.

■ The second reason is that the delay in taking defendant to court is not an illegal detention requiring suppression. This court recently addressed a similar question. In *People v. Dove* (1986), 147 Ill. App. 3d 659, 498 N.E.2d 279, the defendant was arrested at 8 p.m. on a Wednesday and not taken to court until the following Monday. On Sunday, defendant made a statement which he later sought to suppress. This court stated:

"Delay alone, however, is insufficient to penalize the State by excluding incriminating statements obtained during the period between arrest and arraignment. The issue is whether the statements were made voluntarily. Only where the statements are involuntary must they be excluded. *** Unnecessary delay is only one factor to be considered in determining the voluntariness of an incriminating statement. Seventy-two hours, for example, between the arrest and the arraignment does not *per se* render such a statement involuntary. The question of voluntariness is for the trial court to determine on the totality of the circumstances, and its decision will be reversed only if it is against the manifest weight of the evidence." (*Dove*, 147 Ill. App. 3d at 667, 498 N.E.2d at 284.)

We went on to observe that two of those days were Saturday and Sunday, court holidays, and, therefore, the delay was not unnecessary. The factual setting in the present case is identical with that in *Dove*, and we find *Dove* is controlling on this point.

■ Similarly, we find defendant's reliance on his subnormal intelligence misplaced. While subnormal IQ is a factor in determining voluntariness, it does not *ipso facto* make a confession involuntary. (*Hester*, 39 Ill. 2d at 500, 237 N.E.2d at 474; *Creamer*, 143 Ill. App. 3d at 71, 492 N.E.2d at 928; *Berry*, 123 Ill. App. 3d at 1045, 463 N.E.2d at

1047.) In our case, defendant's subnormal IQ is offset by his experience with the criminal system. Dr. Courtois testified that due to this experience, defendant was better able to communicate in this field than most others, and it was his opinion that defendant could understand these rights if they were read to him.

 Defendant argues that if these elements taken alone are not enough to require suppression, then surely taken together they do. He attempts to paint a picture of a young man with subnormal intelligence being held incommunicado for four days and relentlessly grilled until he cracks and confesses. If this picture is correct, then it would appear defendant's argument is compelling. However, when viewed under the brighter light of the record, it is apparent this depiction is inaccurate.

The record clearly established defendant was repeatedly advised of his rights and repeatedly waived them. While this is contrary to defendant's testimony, we note that the trial judge is in the best position to observe the witness's credibility, and the court is not required to accept defendant's version in preference to that of others. (*Creamer*, 143 Ill. App. 3d at 70-71, 492 N.E.2d at 928; *People v. Pinkham* (1985), 139 Ill. App. 3d 554, 557, 487 N.E.2d 707, 709.) The record also establishes defendant was not intoxicated, was not denied food or sleep, nor was he relentlessly interrogated. Defendant began making incriminating statements the moment he entered the station. If defendant had not spoken until the last day, his position might have more merit. However, defendant began speaking promptly, and in each subsequent interrogation, after waiving his rights, gave more incriminating information. There is absolutely no indication that these statements were the result of anything more than defendant voluntarily speaking after having been advised of his rights and waiving same.

 Defendant lastly maintains the statements should be suppressed because the police, by keeping him without seeing a judge for four days, deprived him of his right to counsel. The sixth amendment right to counsel attaches at or after the initiation of adversary judicial proceedings. (*Kirby v. Illinois* (1972), 406 U.S. 682, 689, 32 L. Ed. 2d 411, 417, 92 S. Ct. 1877, 1882.) Defendant asserts that this right should be considered attached since the police were intentionally keeping him from an attorney who would surely have advised defendant to remain silent. Our supreme court recently determined that the action which attaches the right to counsel must be a formal adversary proceeding evidenced by an arraignment or indictment. (*People v. Thompkins* (1988), 121 Ill. 2d 401, 433, 521 N.E.2d 38, 51.) We have already determined, pursuant to *Dove*, that the delay was not im-

proper. Accordingly, since there was no police misconduct and defendant had not yet been arraigned or indicted, it is clear the right to counsel under the sixth amendment had not yet attached.

Defendant next asserts he was denied his right to an impartial jury by the actions of the court in leaving a juror on the jury who had heard a news report that defendant was charged with a second murder. He believes this error was exacerbated when the juror became the foreman of the jury. After the court found out the juror had heard a radio broadcast, which indicated defendant's trial started that day and defendant was also charged with another murder, the following colloquy took place:

"MR. CORYELL [defense counsel]: Mr. Thomasson, what did you hear?

JUROR THOMASSON: I heard the complete broadcast. It talked about this trial starting today, it was one of two charges, that there was another charge pending, something to that effect.

MR. CORYELL: Did the information that there was another charge pending—would that affect your ability to be fair in this case?

JUROR THOMASSON: I don't think so.

MR. CORYELL: You think you can be a fair and impartial juror in this case in spite of that broadcast?

JUROR THOMASSON: Yes, sir.

MR. CORYELL: That's all I have.

THE COURT: All right. I don't think there is any question by you, [prosecutor], is there, or is there?

[PROSECUTOR]: I would like to.

THE COURT: Yes, okay.

[PROSECUTOR]: Can you be positive the information you heard this morning will not affect in any way your ability to be a fair and impartial juror in this case?

JUROR THOMASSON: I think I can listen to the evidence presented in this court room and respond to what is here, and only that.

PROSECUTOR: I'm sorry, 'I think' is a vernacular term. Can you be positive that you will disregard anything you heard?

JUROR THOMASSON: I would follow the judge's instructions, yes, sir.

PROSECUTOR: You understand anything you heard doesn't involve a confession and it is only a charge?

JUROR THOMASSON: I know nothing about the other

charge anyway so I do not see how it can affect my judgment.

PROSECUTOR: You don't know any details about this supposed other charge?

JUROR THOMASSON: Other than what was on the broadcast this morning.

PROSECUTOR: I have no further questions."

The court then admonished him not to discuss this with the other jurors.

It is inherent in a defendant's right to a fair trial that he receive a trial by an impartial jury free from outside influence. (*People v. Talley* (1987), 152 Ill. App. 3d 971, 980, 504 N.E.2d 1318, 1323.) When a trial court becomes aware that jurors have been exposed to news reports, the court must make a meaningful examination of the jurors to determine any prejudice. (*People v. Cain* (1967), 36 Ill. 2d 589, 596, 224 N.E.2d 786, 790; *Talley*, 152 Ill. App. 3d at 980, 504 N.E.2d at 1323.) The question is whether the jurors or any of them have been influenced or prejudiced to the extent that they would not or could not be fair and impartial. (*Talley*, 152 Ill. App. 3d at 980, 504 N.E.2d at 1323.) Such a determination rests within the discretion of the trial court and will be reversed if the discretion is abused. (*People v. Hines* (1988), 165 Ill. App. 3d 289, 298, 518 N.E.2d 1362, 1368.) The burden of establishing whether a juror should be disqualified is on the party challenging the juror. (*People v. Jarnagan* (1987), 154 Ill. App. 3d 187, 197, 506 N.E.2d 715, 722.) A mere suspicion of partiality is not enough. *Jarnagan*, 154 Ill. App. 3d at 197, 506 N.E.2d at 722.

It is apparent the court did not abuse its discretion. The juror obviously had little knowledge of the other offense and indicated it would not affect his decision. The fact that the juror knew defendant was charged with another offense without knowing the details is not the type of impassioning information that would automatically require a juror's exclusion. (See *People v. Taylor* (1984), 101 Ill. 2d 377, 462 N.E.2d 478.) The alleged prejudicial material is not nearly as inflammatory as that in our recent cases of *Hines* and *Talley* where we affirmed the refusal to dismiss a juror.

Defendant next asserts the court erred by giving the State's issue instruction for the offense of murder. The instruction read:

"To sustain the charge of murder, the State must prove the following propositions:

FIRST: That the defendant or one for whose conduct he is legally responsible performs the acts which caused the death of [D.H.]; and

SECOND: That when the defendant or one for whose conduct he is legally responsible did so, he intended to kill or do great bodily harm to [D.H.];

or

he knew that his acts would cause death or great bodily harm to [D.H.];

or

he knew that his acts created a strong probability of death or great bodily harm to [D.H.];

or

he was committing the offense of Residential Burglary or Home Invasion or Aggravated Criminal Sexual Assault.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

At trial, defendant objected to its use because the instruction included the accountability language, and it was his position that since it was a capital case, it is improper to contain accountability theories. Now, on appeal, he asserts this instruction is improper because it denies him his constitutional right to a unanimous verdict.

Preliminarily, we find this argument is waived. It is well settled that failure to object at trial to an asserted error in jury instructions waives the question, and that issues not raised in the post-trial motion following a jury trial are also effectively waived. (*People v. Huckstead* (1982), 91 Ill. 2d 536, 543, 440 N.E.2d 1248, 1251.) In the present case, as noted, defendant did object at trial to the instruction and did raise that objection in his post-trial motion, but that objection was restricted to the accountability language and did not include the theory behind the alleged error defendant now raises. The purpose behind the waiver rule is apparent. The requirement that a defendant specifically raise his objections and alleged errors allows the trial court to address the issues and may save the delay and expense of an appeal where the issue is meritorious, as well as gives the reviewing courts the benefit of the trial court's observations concerning the alleged error. (*People v. Friesland* (1985), 109 Ill. 2d 369, 376, 488 N.E.2d 261, 263; *People v. Irwin* (1965), 32 Ill. 2d 441, 443-44, 207 N.E.2d 76, 78.) Thus, it has been held that specific objections to introduction of evidence waives all other grounds not specified. (*People v. Curry* (1973), 56 Ill. 2d 162, 170, 306 N.E.2d 292, 296.) Similarly, we

find here that the ground for the alleged error in the instruction is raised for the first time on appeal and is, accordingly, waived.

■■■ Defendant's argument also fails on its merits. Defendant asserts the instruction denies him his constitutional right to a unanimous verdict against him because it does not require the jury be unanimous on each element but only on the verdict. Defendant asserts that theoretically six jurors could find he was responsible as principal, and six could find he was responsible under the accountability theory. Further, these jurors could be further divided as to whether the crime was committed with the intent to kill, the knowledge that the acts would cause death, the knowledge that the acts would create a strong probability of death, or that defendant was responsible under the felony murder rule which is further divided into three possible underlying felonies. Accordingly, he asserts there is no indication he received an unanimous verdict.

Neither party presents any Illinois authority on the question. Defendant relies on the Federal case of *United States v. Gipson* (5th Cir. 1977), 553 F.2d 453. In that case, defendant was charged with theft, and the jury was instructed that they could find defendant guilty if they found he received, concealed, stored, bartered, sold, or disposed of the stolen vehicle. The court found this list included two distinct conceptual acts and that it was necessary that these be separated and the jury be unanimous on each group.

However, our analysis of this question, and our review of the Federal authority, convinces us the best rule is that the jury need only be unanimous with respect to the ultimate question of defendant's guilt or innocence of the crime charged, and unanimity is not required concerning alternate ways in which the crime can be committed, and, accordingly, we so hold.

The analysis of the Wisconsin Supreme Court in *Holland v. Wisconsin* (1979), 91 Wis. 2d 134, 280 N.W.2d 288, is illustrative. In that case, a defendant was charged with murder, and the jury was instructed as to the Wisconsin accountability law. The issue was whether this standard instruction phrased disjunctively violated the defendant's right to unanimity. The court stated:

"In *People v. Sullivan*, 173 N.Y. 122, 65 N.E. 989, 989-90 (1903), the court held:

' "It is not necessary that a jury, in order to find a verdict, should concur in a single view of the transaction disclosed by the evidence. If the conclusion may be justified upon either of two interpretations of the evidence, the verdict cannot be impeached by showing that a part of the jury proceeded

upon one interpretation and part upon the other.'' *** So, in this case, it was not necessary that all the jurors should agree in the determination that there was a deliberate and premeditated design to take the life of the deceased, or in the conclusion that the defendant was at the time engaged in the commission of a felony, or an attempt to commit one. It was sufficient that each juror was convinced beyond a reasonable doubt that the defendant had committed the crime of murder in the first degree as that offense is defined by the statute.'

Unanimity is required only with respect to the ultimate issue of the defendant's guilt or innocence of the crime charged, and unanimity is not required with respect to the alternative means or ways in which the crime can be committed. The cases across the country—New York, Michigan, Washington— recognize and note that it is sufficient that all jurors unanimously agree on their ultimate conclusion that the defendant was guilty of the crime charged, though they may not agree on the manner in which the defendant participated in the crime if under any of the alternative ways the defendant would be guilty of the crime charged. To permit any other conclusion would be to permit the guilty defendant to escape accountability under the law because jurors could not unanimously choose beyond a reasonable doubt which of several alternate ways the defendant actually participated, even though all agree that he was, in fact, a participant.
***

Here we have a single offense for which the defendant could be found liable in three alternative ways—direct commission, aiding and abetting, and conspiracy—when the jury unanimously concluded the defendant was guilty of second-degree murder. The jury unanimously found participation, and it was not necessary that it be agreed as to the theory of participation. To require unanimity as to the manner of participation would be to frustrate the justice system, promote endless jury deliberations, encourage hung juries, and precipitate retrials in an effort to find agreement on a nonessential issue.'' *Holland*, 91 Wis. 2d at ____, 280 N.W.2d at 292-93.

While *Holland* dealt with the use of accountability instructions, this rationale has also been used in situations involving intent murder and felony murder. In *Sullivan*, which *Holland* quotes, defendant was charged with murder, and the jury received an instruction that the

jury could find defendant guilty on either a premeditated death theory or a felony murder theory. As the above-quoted language indicated, the court decided only the ultimate question of guilt need be unanimous. This rationale has been adopted in numerous jurisdictions. See *Newsted v. Oklahoma* (Okla. Crim. App. 1986), 720 P.2d 734, *cert. denied* (1986), 479 U.S. 995, 93 L. Ed. 2d 599, 107 S. Ct. 599; *Alaska v. James* (Alaska 1985), 698 P.2d 1161; *Craddock v. Maryland* (1985), 64 Md. App. 269, 494 A.2d 971; *People v. Taggart* (Colo. 1981), 621 P.2d 1375; *Iowa v. Duncan* (Iowa 1981), 312 N.W.2d 519; *Manson v. Wisconsin* (1981), 101 Wis. 2d 413, 304 N.W.2d 729; *Wells v. Commonwealth* (Ky. 1978), 561 S.W.2d 85; *Connecticut v. Edwards* (1972), 163 Conn. 527, 316 A.2d 387; *Oregon v. Hazelett* (1972), 8 Or. App. 44, 492 P.2d 501; *People v. Chavez* (1951), 37 Cal. 2d 656, 234 P.2d 632; *State v. Souhrada* (1949), 122 Mont. 377, 204 P.2d 792; *State v. Flathers* (1930), 57 S.D. 320, 232 N.W. 51.

■■■ We find this rationale compelling. As the *Holland* court observed, to hold otherwise would create chaos with an already overburdened criminal justice system. A contrary ruling would require one of two things. Either the State would be required to select one specific theory to proceed under, which could allow a defendant who participated in the crime to escape justice if the State's proof does not meet the required burden on the selected theory, or the court would be required to give verdict forms which detail all the possible combinations of factors and would insure the jury was unanimous on each factor. For example, if this approach was adopted in the present case, there would have had to have been 12 guilty verdict forms for the offense of murder to comply with all the possible combinations and permutations. In our view, this would unnecessarily hobble an already staggering court system. In the present case, defendant was charged with one murder, being that of D.H. The legislature has established a number of different conducts for which defendant can be found guilty of that offense. All that is necessary is that the jury is unanimous that he is guilty of the offense, regardless of their agreement on the underlying conduct. Here the jury received the instruction requiring unanimous verdicts, and it was also polled concerning the verdict, clearly establishing the verdict was unanimous.

■■■ ■ Defendant's final allegation is that the convictions on the less serious offenses should be vacated, or in the alternative, the sentences on these convictions reduced. He asserts that since the jury found him guilty of residential burglary, aggravated criminal sexual assault, and home invasion, it is only proper to assume the jury found him guilty of felony murder. Since multiple convictions must be va-

cated when they are based on the same physical act, or when one is an included offense of the other (*People v. King* (1977), 66 Ill. 2d 551, 566, 363 N.E.2d 838, 844-45, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273; *People v. Wieland* (1984), 123 Ill. App. 3d 576, 584, 462 N.E.2d 1256, 1262), defendant believes these convictions must be vacated.

As we observed in *People v. Feagans* (1983), 119 Ill. App. 3d 941, 950, 457 N.E.2d 459, 465, defendant's argument must fail because he misapprehends the effect of a general verdict. It is well established that where a jury renders a general verdict, it is presumed to be based on any good charge to which the proof is applicable. (*People v. Lymore* (1962), 25 Ill. 2d 305, 307-08, 185 N.E.2d 158, 159, *cert. denied* (1963), 372 U.S. 947, 9 L. Ed. 2d 972, 83 S. Ct. 941; *Feagans*, 119 Ill. App. 3d at 950, 457 N.E.2d at 465.) Thus, in the present case, the general verdict of guilty of murder would support convictions on all four theories. However, when multiple convictions arise out of a single act, a sentence can only be imposed on the most serious. (*People v. Mack* (1984), 105 Ill. 2d 103, 137, 473 N.E.2d 880, 898.) In *Mack*, the supreme court determined that if multiple convictions are entered for one murder, then the court should consider the intentional murder conviction as the most serious. (*Mack*, 105 Ill. 2d at 137, 473 N.E.2d at 898.) Accordingly, our present case should be considered to consist of a conviction for intentional murder plus the three lesser felonies. It is clear *King* is inapplicable, and the other convictions need not be vacated.

 Defendant lastly maintains that if these convictions are not vacated, then the extended-term sentences imposed for them must be reduced pursuant to *People v. Jordan* (1984), 103 Ill. 2d 192, 469 N.E.2d 569. He is partially correct. We addressed this exact question in *People v. Hines* (1988), 165 Ill. App. 3d 289, 518 N.E.2d 1362. We held there that in facts such as present here, where a natural-life sentence has been imposed, it is permissible to sentence a defendant to an extended term on the Class X felony convictions, but the sentences on all other convictions must be reduced to the maximum non-extended-term sentence. (*Hines*, 165 Ill. App. 3d at 304-06, 518 N.E.2d at 1372-73.) Accordingly, the 60-year sentences for home invasion and aggravated criminal sexual assault are affirmed, and the sentence on the residential burglary is reduced to 15 years.

Affirmed as modified.

KNECHT and SPITZ, JJ., concur.