THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DICKEY GAINES, Defendant-Appellant.

First District (5th Division)   No. 1—89—0804

Opinion filed September 4, 1992.

---

Robert S. Markin and Terri L. Mascherin, both of Jenner & Block, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and James E. Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LORENZ delivered the opinion of the court:

The defendant, Dickey Gaines, and his brother, Michael Gaines, were jointly indicted for two counts of murder, one count of attempted murder, two counts of armed robbery, and other offenses. Defendant and Michael were tried separately. Defendant's jury returned general verdicts of guilt for the crimes charged. The State

requested a death penalty hearing pursuant to which the jury found defendant eligible for the death penalty under subparagraphs (3) and (6) of section 9—1(b) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)). Subsequently, defendant was sentenced to death. On direct appeal, the Illinois Supreme Court reversed one armed robbery conviction but otherwise affirmed the convictions and death sentence. In defendant's *habeas corpus* proceedings, the United States Court of Appeals for the Seventh Circuit held that inadmissible evidence had been used against defendant identifying him as the triggerperson and the remaining evidence supported defendant's existing homicide convictions only under the theory of felony murder. Accordingly, the Seventh Circuit offered the State the following options: to release defendant; to retry defendant; to accept defendant's convictions for felony murder and sentence defendant to a term of years; or to accept defendant's convictions for felony murder and, in another death penalty hearing, attempt to prove defendant's eligibility for the death penalty under the particular requirements of section 9—1(b)(6) (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(6)). The State invoked the last option and the trial court convened for a second death penalty hearing on November 3, 1988. A new jury found that defendant was eligible for the death penalty under section 9—1(b)(6) but, after hearing evidence in mitigation, voted not to impose the death penalty. The trial court then sentenced defendant to natural life in prison. Defendant appealed to this court. We consider: (1) whether defendant is entitled to a new trial in light of the selection and racial composition of his 1979 trial jury; (2) whether defendant's right to a speedy trial was violated pursuant to the period between the disposition by the Seventh Circuit and the November 3, 1988, death penalty hearing; and (3) whether the trial court erred by sentencing defendant to natural life in prison.

We affirm in part, reverse in part, and remand for resentencing.

This case has a long history. In the early morning hours of December 22, 1978, defendant, Dickey Gaines, and his brother, Michael Gaines, along with two other men, Andre Davis and Lenious Thomas, left a bar in Chicago and walked to a house near 117th Street and Michigan Avenue. In a second-floor room, defendant and Michael Gaines announced a stick-up. Immediately, either defendant or Michael fired several shots from a handgun which resulted in the deaths of Andre Davis and another man, Causia McCall, who was

also present in the room. Thomas survived the incident and assisted the police in arresting defendant and Michael.

In 1979, defendant and Michael were tried separately. Michael was convicted of all of the crimes charged except for one armed robbery charge and was sentenced to an extended term of 70 years for the murders and to concurrent 30-year terms for the armed robbery and other offenses. In defendant's trial, the jury returned general verdicts of guilt on the murder charges resulting in defendant's convictions under each of the classifications of murder (Ill. Rev. Stat. 1979, ch. 38, pars. 9—1(a)(1), (a)(2), (a)(3)). Defendant was also convicted of one count of attempted murder, two counts of armed robbery, and other lesser offenses. In view of the murder convictions, the State requested a death penalty hearing under section 9—1(b) (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)). The same trial jury convened for the death penalty hearings. After the eligibility phase of the hearing, the jury found that defendant was over the age of 18 at the time of the murders and that two of the aggravating factors under section 9—1(b) existed, to wit, defendant had been convicted of murdering two or more individuals (section 9—1(b)(3)), and the murdered individuals were killed in the course of another felony (section 9—1(b)(6)). Therefore, the jury found that defendant was eligible for the death penalty. After the aggravation-mitigation phase of the hearing, the jury found that there were no mitigating factors sufficient to preclude the imposition of the death penalty. Accordingly, the trial court sentenced defendant to death.

Defendant appealed his convictions and death sentence directly to the Illinois Supreme Court pursuant to Supreme Court Rule 603 (73 Ill. 2d R. 603). The court reversed one of defendant's convictions for armed robbery but otherwise affirmed the convictions and death sentence. (*People v. Gaines* (1981), 88 Ill. 2d 342, 430 N.E.2d 1046.) Defendant filed a petition for rehearing which was denied and the United States Supreme Court denied defendant's petition for writ of *certiorari*. (*Gaines v. Illinois* (1982), 456 U.S. 1001, 73 L. Ed. 2d 1295, 102 S. Ct. 2285.) Defendant's post-conviction proceedings resulted in no relief. *People v. Gaines* (1984), 105 Ill. 2d 79, 473 N.E.2d 868.

In 1985, defendant petitioned the Federal court for a writ of *habeas corpus.* The district court granted the writ, vacating defendant's death sentence on the ground that defense counsel had been ineffective at the death penalty hearing. (*Gaines v. Thieret* (N.D. Ill. 1987), 665 F. Supp. 1342.) The Seventh Circuit reversed the district court but granted defendant relief on other grounds. (*Gaines*

*v. Thieret* (7th Cir. 1988), 846 F.2d 402.) The Seventh Circuit held that the State trial court improperly admitted hearsay statements by Michael Gaines in defendant's trial identifying defendant as the triggerperson. The Seventh Circuit then stated:

"All this would be academic if the state were content with punishing [defendant] for felony murder, of which he undoubtedly was guilty and for which he could probably have been sentenced to a very long term of years but not to death, unless he was the trigger[person]." (*Gaines v. Thieret* (7th Cir. 1988), 846 F.2d at 407.)

Therefore, the Seventh Circuit initially granted the State 120 days to invoke one of three options: place defendant on trial again; resentence him to a term of years for felony murder; or release him. On June 30, 1988, the court amended its order to allow the State a fourth option: to accept defendant's convictions for felony murder and, in another death penalty hearing, attempt to prove defendant's eligibility for the death penalty under the particular requirements of section 9—1(b)(6) (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(6)), which provided:

"(b) Aggravating Factors. A defendant who at the time of the commission of the offense has attained the age of 18 or more and who has been found guilty of murder may be sentenced to death if:

\*\*\*

6. the murdered individual was killed in the course of another felony if:

(a) the murdered individual was actually killed by the defendant and not by another party to the crime or simply as a consequence of the crime; and

(b) the defendant killed the murdered individual intentionally or with the knowledge that the acts which caused the death created a strong probability of death or great bodily harm to the murdered individual or another; and

(c) the other felony was one of the following: armed robbery, robbery, rape, deviate sexual assault, aggravated kidnapping, forcible detention, arson, burglary, or the taking of indecent liberties with a child." (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(6).)

In other words, at the second death penalty hearing the State would need to prove that defendant was the triggerperson pursuant to subparagraph (a) above without the benefit of the inadmissible evidence. In addition, the State would have to prove that the mur-

ders occurred in the course of an armed robbery pursuant to subparagraph (c) above. The Seventh Circuit's mandate issued on July 14, 1988.

The State invoked the fourth option. On November 3, 1988, the trial court convened for a second death penalty hearing and a new jury was impanelled. Meanwhile, defendant filed another *habeas corpus* petition in the Federal district court alleging that the State did not exercise any of its options within the required 120 days. The district court denied the motion and the Seventh Circuit affirmed.

### 1988 DEATH PENALTY HEARING AND RESENTENCING

The State's key witness during the eligibility phase of the second death penalty hearing was Lenious Thomas. The following is a summary of Thomas' direct examination. At the time of the murders, Thomas had known Davis for 16 years but he did not know McCall. The night of the murders, Thomas and Davis were at a bar at 117th Street and Michigan Avenue in Chicago. Thomas sat by the bar and watched Davis play pool. Thomas asked for and received from Davis a marijuana cigarette. Thomas and another man, whom Thomas did not know, went outside the bar to smoke the marijuana cigarette. Thomas later learned that this man was Michael Gaines. After smoking the marijuana cigarette, the two men reentered the bar and Thomas went back to his seat next to the bar. As it came time for the bar to close, Thomas left the bar with Davis, Michael Gaines, and defendant, who had apparently been in the crowded bar. Thomas had never before met defendant.

The men walked three or four blocks to a two-flat house on 117th Street. Davis told the men that he needed to pick up some clothes and some boots that he had left at the house. Thomas had never been to this house. The men had a conversation while they walked but Thomas did not listen closely.

All four men proceeded to a room on the second floor of the house. A man was sleeping on a mattress on the floor and was wearing Davis' boots. Unable to wake the man, Davis removed the boots, took his own shoes off, and put on the boots. Davis left the room carrying his shoes and a couple of pair of pants. Defendant and Michael stayed in the room.

Davis and Thomas than went to another room down the hall. Davis stated that he wanted to say "hi" or "bye" to Causia McCall, who was sleeping on a couch in this room. Thomas stayed by the door. Thomas testified that he was leaning on the open door with

his left hand and that his right hand was in his back pants pocket. The lights were on in the room.

As Davis began shaking McCall, defendant and Michael arrived in the doorway. According to Thomas, defendant, now standing two to three feet away from Thomas, announced a "stick-up." Michael was in back of and to the right side of defendant. Thomas saw defendant holding a big, black gun in his right hand. Thomas attempted to take two $1 bills out of his back pants pocket with his right hand. Thomas intended to give the $2 to defendant. Defendant, however, fired a shot at Thomas. The shot missed. Thomas then dove for the floor and the two $1 bills dropped to the floor. With his face to the floor, Thomas heard several more shots and then heard footsteps inside the room. From the doorway someone said, "Michael, let's go." Thomas remained still until he heard footsteps leading away from the room.

When Thomas looked up, he saw Davis lying motionless across the couch. McCall remained motionless on the couch. Thomas retrieved one of the two $1 bills on the floor and then he ran from the house to a police station. Thomas returned to the house with the police to find Davis and McCall dead.

In the days after the shootings, Thomas talked to numerous police officers. Thomas also identified defendant and Michael in separate lineups.

The following is a summary of Thomas' cross-examination. Thomas admitted that he smoked a marijuana cigarette about an hour before the shootings but denied that he drank alcohol at the bar. Thomas acknowledged that he testified at Michael's trial that he smoked marijuana earlier the same day as well. Overall, Thomas had been smoking marijuana on a regular basis for about a year before the shootings but quit smoking it a few years later. Thomas pled guilty to possession of marijuana in 1982.

On the day of the shootings, Thomas and Davis played cards at Thomas' house. Thomas' testimony as to the amount of time they spent playing cards differed from his testimony at Michael's trial. They did not gamble over the card game. When they left the house, Thomas had three $1 bills in his back pants pocket. He was also wearing a coat. The two men paid a dollar each to take a bus to visit Davis' girl friend. The girl friend was not home so the two men walked to a liquor store where they found the girl friend. The three talked for 15 minutes and either Davis or the girl friend bought a six-pack of beer. They returned to the girl friend's house. Thomas denied that he drank any of the beer, and he did not know

if the other two drank any of the beer because he was not watching. Thomas testified that he was not a drinker, but he admitted that he had testified at Michael's trial that he "usually drank beer."

Thomas could not consistently account for the amount of time that he stayed at the girl friend's house or for the events that followed. Although Thomas testified that he and Davis left the girl friend and went straight to the bar at 117th Street and Michigan Avenue, he did not remember testifying at Michael's trial that he, Davis, and the girl friend went to a restaurant before going to the bar.

Thomas and Davis arrived at the bar around 12:30 a.m. As described above, Thomas smoked the marijuana cigarette with Michael. Thomas, Davis, Michael, and defendant left the bar to walk to the house where the shootings occurred. During the walk, Michael asked Thomas if he could cover a $25 bet. Thomas answered "no," but he did not remember if he told Michael that he had only two $1 bills in his possession.

After Davis recovered the boots and clothing in the first room, Davis and Thomas went to the second room. Contrary to his direct examination, Thomas testified that he did not remember whether there was a ceiling light in the room, but he thought there was a light on in the hallway outside the door. Thomas did not remember testifying at Michael's trial that he did not know whether there was any lighting in the hallway outside the door. Thomas was standing on the left side of the doorway inside the room. He was watching Davis near the couch when defendant and Michael arrived at the doorway behind him. Thomas did not see Davis at any time look over towards the doorway. When defendant announced the stick-up, Thomas turned toward him.

Thomas testified that defendant fired the first shot "a second" after he announced the stick-up. Thomas immediately dove for the floor after the first shot was fired and he did not look up again. He did not know where the first shot went. After hearing the footsteps in the room, he heard a voice outside the room say, "Michael, let's go."

Thomas did not remember telling the police that he did not know who did it. Thomas did not remember telling the police that he could not describe what defendant was wearing and could describe only that Michael was wearing a tan hat and gloves. Thomas did not remember that he waited until five days after the shootings before he told the police about money being taken. Thomas did not

remember telling the police that nobody came into the room. Thomas could only describe the gun as big and black.

Detective Robert Dwyer of the Chicago police department also testified for the State during the eligibility phase of the second death penalty hearing. On the night after the shooting, Dwyer was at the home of defendant's mother. Michael was also at the home. The telephone rang and defendant's mother gave Dwyer permission to listen to the phone call on an extension phone. Defendant had placed the call. Dwyer heard the following conversation between defendant and his mother: defendant asked what his mother was doing and why the family was not helping defendant; defendant said he knew the family was working with the police; he asked her what was wrong with Michael and stated that Michael was the only one that she cared about; finally, defendant asked his mother why she had not obtained money for him so he could leave town. Michael then got on the phone and Dwyer heard the following conversation between the brothers: defendant stated that he was going to "knock" Michael; defendant asked why Michael was not doing his part and stated, "don't you know that we can get the chair for what we done"; and defendant asked why Michael did not put the gun where he was supposed to. The phone call ended when Michael stated that he would put the gun where he was supposed to.

Dwyer testified that, after the phone call, Michael took another police officer to the attic in the mother's home where the gun was recovered.

The State also presented testimony from several other police officers; the doctor who performed the autopsies on the victims; a firearms expert; and a friend of defendant. The firearms expert testified that the bullets that were recovered from the victims' bodies were fired from the same gun recovered in the attic.

Defendant called several witnesses during the eligibility phase of the second death penalty hearing. Oliver Emerson testified that he was in the bar at 117th Street and Michigan Avenue the night of the shootings. He saw Michael arguing with Causia McCall outside the bar. Shannon Ware testified that earlier in the day he was in the house where the shootings occurred and he saw Davis, McCall, Michael, and others, but not defendant, smoking marijuana and shooting dice. Harold Fullman, a private investigator, testified that he saw Thomas smoking marijuana a week before he testified for the State at defendant's second death penalty hearing. Investigator Edmund Leracz of the Chicago police department testified that Thomas told him that he had been drinking beer in a bar and at a

woman's house for more than an hour the night of the shootings and that neither Michael nor defendant entered the room after the shots were fired.

Defendant's final witness was Dr. David Hartman, an expert in neuropsychology and neuropsychological toxicology. Dr. Hartman testified that marijuana use impairs a person's ability to perceive and recall events, and that these effects are exacerbated when the person perceiving the events has consumed alcohol, or when the events were traumatic and happened very quickly.

Defendant did not testify at the eligibility hearing.

After the evidence was presented, the jury deliberated for several hours. The jury found that defendant was the triggerperson and that the murdered individuals were killed in the course of an armed robbery. Defendant was thereby rendered eligible for the death penalty.

During the aggravation-mitigation phase of the second death penalty hearing, the State presented seven witnesses and defendant presented 21 witnesses. This time the jury found that there were sufficient mitigating factors to preclude the imposition of the death penalty.

The court then held a sentencing hearing. The court applied the sentencing guidelines that were in effect at the time of defendant's original sentence. Those guidelines provided in part:

> "(1) for murder, a term shall be not less than 20 years and not more than 40 years, or, if the court finds that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty or that any of the aggravating factors listed in [paragraph 9—1(b)] are present, the court may sentence the defendant to a term of natural life imprisonment." (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(1).)

After the hearing, the court sentenced defendant to natural life in prison. The transcript of the proceedings shows that the trial court relied on the following in entering the sentence: defendant had not changed since the day of the shootings; defendant had not been a model prisoner; he took two lives; and defendant would be likely to commit similar crimes. However, the court made no finding that the murders were exceptionally brutal or heinous. Furthermore, by virtue of the Seventh Circuit's disposition, the court's consideration of aggravating factors was limited to those factors listed in section 9—1(b)(6). Therefore, the court's sentence of natural life in prison stands upon the evidence showing that defendant was the trigger-

person and that the murdered individuals were killed in the course of an armed robbery.

After the court denied defendant's motion for a new trial and motion to vacate his sentence, defendant filed this appeal.

OPINION

■ We first address the issues raised by defendant pertaining to the selection and composition of his 1979 trial jury. Despite the numerous dispositions by the State and Federal courts, defendant argues that these issues are still pending. We disagree. Both the State and Federal courts have determined that defendant cannot prevail on these issues. (*E.g., People v. Gaines* (1981), 88 Ill. 2d 342, 430 N.E.2d 1046; *Gaines v. Thieret* (N.D. Ill. 1987), 665 F. Supp. 1342.) Therefore, it is not necessary for us to address these issues again.

■ We next address whether defendant's right to a speedy trial was violated in view of the period between the Seventh Circuit's disposition and the November 3, 1988, death penalty hearing. The Seventh Circuit's disposition involved several relevant dates: On May 4, 1988, the Seventh Circuit issued its opinion offering the State the first three options. The State filed a petition for rehearing requesting a rehearing *en banc* before the Seventh Circuit. This petition was eventually denied on July 6, 1988. However, on June 30, 1988, the Seventh Circuit entered an order amending the May 4 opinion thereby offering the State the fourth option. The Seventh Circuit's mandate issued on July 14, 1988. In sum, the November 3, 1988, death penalty hearing was within 120 days of the July 14 mandate but was not within 120 days of either the May 4 opinion or the June 30 order amending the opinion. Therefore, whether defendant's right to a speedy trial was violated will depend on a determination of which date commenced the running of the 120 days. In this regard, the Seventh Circuit entered an order stating "the 120 day period at issue in this appeal began to run on July 14, 1988, the date the mandate issued." Consistent with this order, we hold that defendant's right to a speedy trial was not violated.

We next address defendant's resentencing. As stated above, the trial court's sentence of natural life in prison stands upon a finding that defendant was the triggerperson and that the murdered individuals were killed in the course of an armed robbery. Defendant has challenged the sufficiency of the evidence for both of these findings. If the evidence does not support either finding, then defendant's sentence of natural life in prison must be set aside. The stand-

ard of review is whether the evidence is so unreasonable, improbable or unsatisfactory that it does not provide proof of the findings beyond a reasonable doubt. *People v. Smith* (1991), 141 Ill. 2d 40, 565 N.E.2d 900.

■ The only witness the State called who could give firsthand testimony identifying the triggerperson was Lenious Thomas. We believe that Thomas' testimony as a whole raises serious questions of credibility. While it is true that a credibility determination made by a trier of fact is entitled to great deference, it is not conclusive. (*Smith*, 141 Ill. 2d 40, 565 N.E.2d 900.) We also point out that we are not the first court to question the weight of Thomas' testimony. The Seventh Circuit stated in its opinion that Thomas "was not a fully credible witness." (*Gaines v. Thieret*, 846 F.2d at 406.) More importantly, we believe that Thomas' testimony was so unsatisfactory that it cannot stand as proof beyond a reasonable doubt that defendant was the triggerperson.

Thomas testified that during the crucial moments before the shootings, he was leaning against the bedroom door with his back to the doorway. Defendant and Michael came up to the doorway from behind Thomas. When the stick-up was announced, Thomas testified that he turned towards the doorway and saw defendant and Michael. However, Thomas also testified that Davis never looked toward the door. It simply does not follow that Thomas could turn toward the door to see defendant and Michael and continue to watch Davis on the other side of the room. At any rate, Thomas testified that the first shot was fired a "second" after the stick-up was announced and he then dove for the floor and never looked up again. Therefore, the only opportunity that Thomas had to identify the triggerperson occurred in a "second's" time. On this basis, we believe that there is at least a reasonable doubt whether Thomas could turn to the door, locate the position of defendant and Michael, distinguish defendant from Michael, and identify defendant as the one holding the gun. To further complicate matters, Thomas had never met either defendant or Michael and, in addition, Thomas was unable to describe satisfactorily the clothing the two brothers were wearing. It is also at the very least doubtful whether there was any lighting either in the room or outside in the hallway.

We also must consider that Thomas' perception was impaired at the time of the shootings. Thomas admitted that he smoked a marijuana cigarette about an hour before the shootings. Dr. Hartman testified that marijuana use impairs a person's ability to perceive and recall events, and that these effects are exacerbated when the

person perceiving the events has consumed alcohol or when the events were traumatic and happened very quickly. Accordingly, the effects of the marijuana on Thomas were exacerbated at the very least because the shootings were traumatic and occurred very quickly. The effects may have been further exacerbated in light of the evidence suggesting that Thomas also consumed alcohol before the shootings.

In sum, not only did Thomas' identification occur in a "second's" time and under questionable conditions, but Thomas also suffered from exacerbated impaired perception. Again, we think that Thomas' testimony cannot stand as proof beyond a reasonable doubt that defendant was the triggerperson.

Moreover, other evidence suggests that Michael, not defendant, was the triggerperson. Shannon Ware testified that Michael and the two victims, but not defendant, had been in the house of the shootings earlier that day smoking marijuana and gambling. Oliver Emerson testified that he saw Michael argue with McCall at the bar the night of the shootings. After leaving the bar, Michael asked Thomas whether he could cover a $25 bet. Also, the evidence shows that Michael, not defendant, entered the room after the shooting, and Michael, not defendant, had possession of the gun when it was recovered by the police.

Finally, the remaining evidence presented by the State, including the testimony of Officer Dwyer concerning the phone conversations, reveals nothing tending to show that defendant was the triggerperson.

In conclusion, we hold that there was insufficient evidence to prove beyond a reasonable doubt that defendant was the triggerperson. Therefore, it is not necessary that we address whether there was insufficient evidence to prove that the murdered individuals were killed in the course of an armed robbery.

Accordingly, defendant's sentence of natural life in prison must be set aside. Although this court has the authority to enter a new sentence for defendant (134 Ill. 2d R. 615(b)(4)), both the State and defendant have suggested that this court remand the case to the trial court for resentencing. Therefore, we remand this case for resentencing.

Affirmed in part; reversed in part and remanded.

McNULTY, P.J., and GORDON, J., concur.