FIFTH DIVISION
January 25, 2008

No. 1-06-1263

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | |
| | ) | |
| RONALD BATTLE, | ) | Honorable |
| | ) | Luciano Panici, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE GALLAGHER delivered the opinion of the court:

A jury convicted defendant of first degree murder and armed robbery in connection with the robbery and shooting death of James Johns. After the jury convicted defendant, the trial court sentenced him to consecutive terms of 50 years' imprisonment for murder, 20 years' imprisonment for armed robbery, and an additional 25 years based on the jury's finding that the defendant used a firearm during the commission of the offense that was a proximate cause of Johns' death. Defendant now appeals the judgment on three different grounds. First, defendant contends that the trial court denied him a fair trial by instructing the jury with an improper version of Illinois Pattern Jury Instructions, Criminal, No. 3.15 (4th ed. 2000) (IPI Criminal 4th No. 3.15). Second, defendant claims that he was denied a fair trial when the trial court refused

1

to give the jury instructions on, and a separate verdict form for, felony murder. Third, defendant asserts that the trial court abused its discretion by sentencing him to 95 years in prison. For the following reasons, we affirm the judgment, but modify defendant's sentence.

BACKGROUND

Defendant was charged with first degree murder and armed robbery in connection with an incident on May 29, 2003. His jury trial commenced on March 29, 2006, and produced the following evidence.

On the morning of May 29, 2003, Johns was working alone in his store, the Gold and Diamond Connection jewelry store, in Calumet City, Illinois. Irene Sanchez testified that she arrived at the store after 9 a.m. to pick up some jewelry she had on lay-away. She testified that the four previous times she had been in the store, she came to know Johns by his first name and noticed that he was the only one behind the counter while she was in the store. On that morning, however, Sanchez parked her car in front of the store and noticed a young black man, whom she later identified as defendant, behind the counter. Sanchez testified that when defendant saw her, he came out from behind the counter, walked toward the front door, made eye contact with her, and exited the store right with an overstuffed white garbage bag. Sanchez stated that as defendant walked from the store past a beauty salon, the garbage bag broke and "the stuff fell out" on the lawn in front of the salon. The defendant picked up some articles, ran to his car, which Sanchez described as a large, "boxy," older model black car, and sped off.

Sanchez returned to the jewelry store to ring the buzzer, but did not see anybody in the store. Sanchez testified that she decided to walk over to the salon and as she passed the lawn she

noticed all kinds of jewelry lying on the ground. She immediately became alarmed and called police. Later that day, Sanchez traveled to the police station, where a computer sketch was made from her description of the offender–22 years old, 6 feet tall, stocky build, short hair, and wearing a beige-colored jogging suit with rust-colored lettering. On June 5, 2003, Sanchez returned to the police station to identify defendant from a lineup as the man she saw leaving the jewelry store.

Lieutenant Tim Murphy of the Calumet City police department testified that he received a 911 call at approximately 9:34 a.m. to go to the jewelry store. When he arrived, he testified that he was unable to open the store's door and could not see anyone in the store. After standing on the front ledge to get a better look inside, Murphy saw Johns lying face down in blood behind the counter. At that sight, Murphy testified that he broke the window on the front door to gain entry into the store and observed a gunshot wound to Johns' head, which was the cause of death.

Constance Daniel lived at 7628 South Jeffrey on May 29, 2003, and testified that she noticed a black Ford LTD, which she had not seen before, in the parking lot behind the building and called to have it towed. Later that night, after hearing the description of a similar car on the news, she called the police to report the car.

Detective Donald Joswiak of the Calumet City police department testified next concerning his role in the investigation. Joswiak testified that after receiving the tip from Daniel, he discovered that the car was registered to Yvonne Key, defendant's mother, who lived about two miles from the store. After speaking to Key, Joswiak went to defendant's girlfriend's home at 7630 South Jeffrey, right next door to Daniel's home. After interviewing defendant's girlfriend, Joswiak proceeded to 5330 South Wood, where he spoke with Tommy Johnson.

Johnson told Joswiak that defendant asked him to sell 10 rings. After Johnson had sold four rings, the police confiscated the other six rings. While Joswiak was speaking with Johnson, defendant was apprehended while attempting to exit Johnson's back door.

On June 6, 2003, after being Mirandized, defendant gave a videotaped statement[1] to Assistant State's Attorney Kent-Duffy and Detective Rapacz, in which he admitted that he went to the jewelry store to rob it because he owed $10,000 to a drug dealer. When he first entered the store at 8:30 a.m., Johns said the jewelry would not be out until 9 a.m. so defendant left and returned after 9 a.m. While looking at rings, defendant stated that he pulled a gun on Johns. When Johns reached under the counter for, presumably, a gun, defendant shot Johns. Following the shooting, defendant stated that he took a garbage bag, filled it with jewelry, and left the store.

The defendant stated that he went to his girlfriend's house after committing the robbery and told her that he "went to try to rob the man and that it was either gonna be him or me." Defendant also corroborated Johnson's testimony that he gave Johnson rings from the robbery to sell on his behalf. Defendant concluded the videotaped statement by saying that nobody threatened or coerced him into making the statement.

Before the State rested, the parties stipulated that six phone calls were made to defendant's home on May 29, 2003, including calls made at 9:31:38 a.m. and 9:32:25 a.m., each of which lasted zero seconds, and one at 9:35:35, which lasted 1 minute and 38 seconds. The

---

[1] After establishing the necessary foundation, defendant's videotaped confession and the transcript were published into the record.

parties further stipulated that a zero-second call means no one answered the call while a message left on a voicemail or answering machine is reflected as if someone actually received the call.

Key testified in support of defendant, contending that she called home at 9:30 a.m. on the morning of the shooting and spoke to defendant. Defendant testified that he allowed his cousin, Donnell Coleman, to borrow his car on the morning of May 29, 2003. Coleman returned 30 to 45 minutes later with a white garbage bag filled with jewelry. Defendant figured the rings were stolen and, because he was on parole, decided to leave his house. Thus, defendant and Coleman drove to his girlfriend's house, where he left his car, and proceeded on a bus to Coleman's friend's house. Defendant testified that at the friend's house Coleman told him about the shooting and gave him 30 rings, which in turn he gave to Johnson.

Defendant asserted that he gave his statement on videotape because the police threatened to arrest his mother. Defendant claimed that he did not tell police about Coleman's confession because he was not raised to tell on anybody. Defendant presented no other witnesses.

During the jury instruction conference, defendant objected to the State's IPI Criminal 4th Nos. 2.01, 3.15, 7.01, 7.02, and 26.01, all of which the trial court denied. The defendant also submitted modified instructions (IPI Criminal 4th Nos. 7.01, 7.02) and verdict forms (IPI Criminal 4th No. 26.05) on the felony murder charge, but the trial court sustained the State's objections to the instructions and verdict forms.

After receiving the instructions, the jury found defendant guilty of first degree murder and armed robbery. The jury also made a special finding that, during the commission of the offense, defendant personally discharged a firearm, which caused Johns' death. After a hearing on mitigation and aggravation, the trial court sentenced defendant to consecutive terms of

imprisonment of 50 years for murder and 20 years for armed robbery. The trial court also sentenced defendant to an additional 25 years' imprisonment pursuant to the jury's special finding. Defendant now appeals his convictions and sentence.

## ANALYSIS

### I. IPI Criminal 4th No. 3.15

Defendant's first contention on appeal is that his right to a fair trial was abridged when the trial court instructed the jury with an improper version of IPI Criminal 4th No. 3.15. When the issue is preserved, as it is here, "'[i]t is well settled that a defendant's claim of improper jury instructions is reviewed under a harmless-error analysis.'" *People v. Gonzalez*, 326 Ill. App. 3d 629, 636, 761 N.E.2d 198, 204 (2001), quoting *People v. Amaya*, 321 Ill. App. 3d 923, 929, 748 N.E.2d 1251, 1256 (2001). Error arising from a submitted jury instruction is harmless only if submission of the proper instruction would not have changed the result. *People v. Shaw*, 186 Ill. 2d 301, 323, 713 N.E.2d 1161, 1174 (1998).

There is a two-step process when applying the harmless-error analysis. First, we determine whether "any error occurred–in other words, whether the instruction was correct." *People v. Dennis*, 181 Ill. 2d 87, 95-96, 692 N.E.2d 325, 330 (1998). If we find an error occurred, then we must determine "whether, in spite of that error, evidence of defendant's guilt was so clear and convincing as to render the error harmless beyond a reasonable doubt." *Dennis*, 181 Ill. 2d at 96, 692 N.E.2d at 330.

1-06-1263

The trial court instructed the jury with IPI Criminal 4th No. 3.15,[2] which was submitted to the jury as follows:

"When you weigh the identification testimony of a witness, you should consider all the facts and circumstances in evidence, including, but not limited to, the following:

The opportunity the witness had to view the offender at the time of the offense.

or

The witness's degree of attention at the time of the offense.

or

The witness's earlier description of the offender.

or

---

[2] The trial court used this version of IPI Criminal 4th No. 3.15 despite the fact it was changed in 2003 to remove the "ors" between the factors. See IPI Criminal 4th No. 3.15 (Supp. 2003). It is commonly understood that brackets indicate a disjunctive relationship. Thus, the bracketed "ors" should signal that only the factors that are supported by the evidence should be given, the other factors discarded, and the "ors" completely removed from the submitted instruction. Yet many trial courts, including the trial court in this case, submitted the instruction with the bracketed "ors" and all the factors included. Therefore, the Supreme Court Committee on Pattern Jury Instructions in Criminal Cases removed the bracketed "ors" to avoid further confusion and more errors in prospective cases.

7

The level of certainty shown by the witness when confronting the defendant.

or

The length of the time between the offense and the identification confrontation."

## A. Whether an Error Occurred

Both parties recognize that the Illinois Supreme Court has determined that IPI Criminal 4th No. 3.15 with the "ors" between the factors is "plain error." *People v. Herron*, 215 Ill. 2d 167, 191, 830 N.E.2d 467, 482 (2005). We adhere to the reasoned conclusion of our supreme court and therefore rule that the instruction the trial court submitted to the jury was clearly error.

## B. Whether the Error Was Harmless

As an initial matter, defendant suggests that we abandon the harmless-error standard because of the seriousness of the error. Defendant contends that the erroneous instruction lessened the State's burden and thus is the same type of instruction that *Sullivan v. Louisiana*, 508 U.S. 275, 124 L. Ed. 2d 182, 113 S. Ct. 2078 (1993), which involves a constitutionally deficient reasonable doubt instruction, found infirm enough to make harmless-error analysis inapplicable.

In *Sullivan*, the United States Supreme Court recognized that most constitutional errors are subject to harmless-error analysis, yet ruled that the submission of a constitutionally deficient reasonable doubt instruction can never be deemed harmless error. *Sullivan*, 508 U.S. at 279, 124

L. Ed. 2d at 189, 113 S. Ct. at 2081. The Court found it illogical to apply harmless-error review to a constitutionally deficient reasonable doubt instruction. *Sullivan*, 508 U.S. at 280, 124 L. Ed. 2d at 189, 113 S. Ct. at 2082. The Court observed that the denial of the right to a jury verdict of guilt beyond a reasonable doubt is a "'structural defect[] in the *** trial mechanism,'" and without that "'basic protectio[n]' *** a criminal trial cannot reliably serve its function." *Sullivan*, 508 U.S. at 281, 124 L. Ed. 2d at 190-91, 113 S. Ct. at 2082-83, quoting *Arizona v. Fulminante*, 499 U.S. 279, 309, 113 L. Ed. 2d 302, 331, 111 S. Ct. 1246, 1265 (1991). Consequently, the Court reasoned that there would be no "guilty-beyond-a-reasonable-doubt" jury verdict within the meaning of the sixth amendment, which makes the question of whether "the *same* verdict of guilty-beyond-a-reasonable-doubt would have been rendered absent the constitutional error *** utterly meaningless." (Emphasis in original.) *Sullivan*, 508 U.S. at 280, 124 L. Ed. 2d at 189-90, 113 S. Ct. at 2082.

Notably, in his concurring opinion Chief Justice Rehnquist recognized that "a constitutionally deficient reasonable-doubt instruction is a breed apart from the many other instructional errors that we have held are amenable to harmless-error analysis." (Emphasis omitted.) *Sullivan*, 508 U.S. at 284, 124 L. Ed. 2d at 193, 113 S. Ct. at 2084 (Rehnquist, C.J., concurring). However, Chief Justice Rehnquist observed that "it is a rare case in which a constitutional violation will not be subject to harmless-error analysis," citing to *Fulminante* for examples of structural errors, none of which includes an erroneous instruction on how a jury should weigh a witness's identification. *Sullivan*, 508 U.S. at 282, 124 L. Ed. 2d at 191, 113 S. Ct. at 2083 (Rehnquist, C.J., concurring), citing *Fulminante*, 499 U.S. at 309-10, 113 L. Ed. 2d at 331, 111 S. Ct. at 1265.

Here, there was no constitutionally deficient reasonable doubt instruction given to the jury. Because the instructional error in *Sullivan* is a structural error–a breed apart from most instructional errors, including the instruction in this case–we find that the holding in *Sullivan* has no bearing on the issue at hand. Therefore, we continue to adhere to the harmless-error test when determining whether the erroneous instruction requires reversal.

We must now determine whether, had the trial court given the jury the proper instruction, the evidence proving defendant's guilt was so clear and convincing that the error was harmless beyond a reasonable doubt. *Dennis*, 181 Ill. 2d at 96, 692 N.E.2d at 330; *People v. Furdge*, 332 Ill. App. 3d 1019, 1031, 774 N.E.2d 415, 426 (2002). We view the instruction in light of the evidence and facts adduced at trial. *People v. Kasp*, 352 Ill. App. 3d 180, 194, 815 N.E.2d 809, 822 (2004). Based on the record before us, we find that the error was harmless.

First, we will consider the five factors listed in the instruction. On the morning of the shooting, Sanchez arrived at the store expecting to see Johns behind the counter because she had never seen anyone else behind the counter. Instead, she noticed another man, later identified as defendant, behind the counter. As she walked to the store's front door, defendant walked right past her, even making eye contact with her. Thinking this strange because someone other than Johns was behind the counter, she focused her undivided attention on defendant. Moreover, as defendant walked and then ran from the store, Sanchez watched him drop the jewelry in the lawn, pick up what he could, and then flee in his car. This encounter gave Sanchez a good opportunity to view defendant.

After the police arrived, Sanchez accompanied them to the police station and gave the police a description, which produced an accurate composite sketch of the assailant. While

Sanchez's description was somewhat inaccurate regarding defendant's weight, she gave a description of the assailant that was strikingly similar to defendant, right down to the clothes he wore that day. Sanchez's description of defendant never vacillated and only a week after the incident, she identified defendant in a police lineup. She later identified defendant at trial also.

Other evidence also supports defendant's conviction. Sanchez's description of defendant's car was corroborated when Daniel called in a tip regarding defendant's car. After receiving that tip, Joswiak confirmed that the car was registered to defendant's mother, who subsequently informed police that defendant drove that car. When police attempted to track defendant down, they encountered Johnson, who told them that on the day of the shooting defendant gave him 10 rings to sell, 6 of which Johnson still had on his person.

The State also has defendant's videotaped confession, which corroborates much of the testimony of Sanchez and other witnesses. In the confession, defendant admitted going to the jewelry store to commit a robbery and shooting Johns when he resisted. Defendant also admitted that he drove to his girlfriend's house and left his car in the lot from which it was later towed. In addition, defendant admitted that he had given Johnson rings–stolen from Johns–to sell.

Nevertheless, defendant claims that the error cannot be harmless because only Sanchez could identify him as the offender and her description of the assailant's weight differed from his weight by 70 pounds. Defendant argues that this discrepancy, in conjunction with the fact that the jury deliberated five hours over an "otherwise straightforward presentation of [Sanchez's] purportedly certain identification," suggests the evidence is closely balanced. We find no merit in defendant's *non sequitur* that the weight discrepancy and five hours of deliberation suggest

11

the evidence is closely balanced. We also believe that defendant's argument lacks merit because this case is distinguishable from *Herron* and *Piatkowski*, which defendant also cites for support.

In *Herron*, the defendant was charged with and convicted of first degree murder and armed robbery stemming from an incident at the Ramada Inn on South Lake Shore Drive in Chicago. *Herron*, 215 Ill. 2d at 170, 830 N.E.2d at 469. Two men entered the Ramada Inn and approached Eiland, the hotel's front desk supervisor, telling her that they wanted money. *Herron*, 215 Ill. 2d at 170, 830 N.E.2d at 470. Eiland described one man as tall and another man, allegedly the defendant who stands 5 feet 10 inches tall, as "shorter, 'probably around five-five,'" with an unshaven face. *Herron*, 215 Ill. 2d at 170, 830 N.E.2d at 470. Comanse, the hotel's front office manager, also encountered the shorter man and described him as 5 feet 10 or 5 feet 11 with spotty facial hair. *Herron*, 215 Ill. 2d at 171, 830 N.E.2d at 470.

Fifteen months after the incident, the defendant was arrested and participated in several lineups. *Herron*, 215 Ill. 2d at 171-72, 830 N.E.2d at 470. Several hotel employees could not identify anyone in the lineups whereas Eiland identified someone as the taller man but did not identify the defendant as the smaller man. *Herron*, 215 Ill. 2d at 172, 830 N.E.2d at 470-71. Thus, Comanse was alone as identifying the defendant as one of the robbers. *Herron*, 215 Ill. 2d at 172, 830 N.E.2d at 471. At trial, the court instructed the jury using IPI Criminal 4th No. 3.15 with the "ors" included between the factors. *Herron*, 215 Ill. 2d at 173, 830 N.E.2d at 471. In addition, during closing arguments the State included the "ors" between the factors while discussing the instruction with the jury. *Herron*, 215 Ill. 2d at 173, 830 N.E.2d at 471. The jury convicted the defendant. *Herron*, 215 Ill. 2d at 173, 830 N.E.2d at 471.

On appeal, we reversed the defendant's conviction and remanded for a new trial based on a plain-error analysis. *Herron*, 215 Ill. 2d at 173, 830 N.E.2d at 471. First, we ruled that the instruction that included the "ors" was error. *Herron*, 215 Ill. 2d at 190, 830 N.E.2d at 481. Then, we found that the error was not harmless because the evidence was closely balanced and not overwhelmingly against the defendant. *Herron*, 215 Ill. 2d at 190, 830 N.E.2d at 481.

Our supreme court agreed, first ruling that the instruction, which included the "ors" between the factors, was plain error. *Herron*, 215 Ill. 2d at 191, 830 N.E.2d at 482. Then our supreme court concluded that the error was not harmless, reasoning:

> "Comanse was the only witness who could identify the defendant as one of the robbers, but his physical description of the shorter man conflicted with Eiland's description. The case, then, turned on the credibility of Comanse's identification testimony, and the erroneous jury instruction involved how the jury should weigh such identification testimony. *** The jury's verdict may have been different with a different instruction." *Herron*, 215 Ill. 2d at 193-94, 830 N.E.2d at 483-84.

In *Piatkowski*, the defendant was convicted of first degree murder, attempted first degree murder, and aggravated battery stemming from a shooting incident. *People v. Piatkowski*, 225 Ill. 2d 551, 554, 870 N.E.2d 403, 404 (2007). In that case, Fragoso and Ladezma testified that they saw the defendant shoot at them from a van on the night of July 4, 1994. *Piatkowski*, 225 Ill. 2d at 555-58, 870 N.E.2d at 405-07. After the close of evidence, the trial court instructed the jury using IPI Criminal 4th No. 3.15 with the "ors" between the factors. *Piatkowski*, 225 Ill. 2d at 561-62, 870 N.E.2d at 408.

On appeal, the appellate court, with one justice dissenting, affirmed the defendant's convictions using a plain-error analysis. *Piatkowski*, 225 Ill. 2d at 562, 870 N.E.2d at 409. While the majority found that the instruction was erroneous, it found the error harmless because the evidence was not closely balanced. *Piatkowski*, 225 Ill. 2d at 562-63, 870 N.E.2d at 409. The dissenting justice disagreed, arguing that the case was closely balanced because the witnesses did not know the defendant and saw him for a short time, and there was no corroborating evidence, no confession, and no physical evidence. *Piatkowski*, 225 Ill. 2d at 563, 870 N.E.2d at 409.

Our supreme court reversed, concluding that the evidence was closely balanced enough to make the error not harmless. *Piatkowski*, 225 Ill. 2d at 572, 870 N.E.2d at 414. Our supreme court noted that the State presented no physical evidence or inculpatory statements by the defendant. *Piatkowski*, 225 Ill. 2d at 567, 870 N.E.2d at 412. The only evidence was the testimony of Fragoso and Ladezma. *Piatkowski*, 225 Ill. 2d at 567, 870 N.E.2d at 412. After examining the witnesses' testimony in light of the factors found in the instruction, the court concluded:

> "This case turned on the credibility of the witnesses' identification testimony and the erroneous instruction involved how the jury would weigh and evaluate such identification testimony. While we do not mean to imply that a new trial is required in every case where this *** instruction is given and the only evidence against defendant is identification testimony, we believe that a new trial is required in this case *** particularly where the witnesses were only able to view the suspect for as little as a few seconds, did not previously know the

14

suspect, some discrepancies existed in their prior descriptions and a lapse of more than six months occurred from the crime to the identification." *Piatkowski*, 225 Ill. 2d at 570, 870 N.E.2d at 413.

Defendant's case contrasts with these two cases in very important ways. First, it is not wholly dependent on Sanchez's eyewitness testimony. Here, the State has physical evidence, such as defendant's car and the rings confiscated from Johnson. Further, the State has phone records showing that calls were placed to defendant's house when the crime was being committed and when defendant alleges he was home. These records show that two calls went unanswered and another, lasting 1 minute and 38 seconds, was the likely result of the caller leaving a voicemail. Most important, the State has defendant's videotaped confession, which corroborates most, if not all, of the witnesses' testimony and includes defendant admitting to the crime.

We find this case more analogous to *Furdge*, wherein we found that the evidence–the witness knew the defendant for many years, identified him the night of the shooting and at trial, and other witnesses' testimony corroborated the witness' testimony–was not closely balanced and made any error harmless beyond a reasonable doubt. *Furdge*, 332 Ill. App. 3d at 1032, 774 N.E.2d at 426-27. Likewise, we conclude that any error in submitting the improper instruction in this case was harmless beyond a reasonable doubt.


## II. Jury Instructions and Verdict Forms Regarding Murder

Defendant contends that he was denied a fair trial when the trial court denied his request for separate jury instructions and verdict forms for felony murder. Defendant argues that if the

jury had returned a verdict of guilty on felony murder based on the armed robbery, he could not have received a consecutive 20-year sentence for the armed robbery because as the predicate offense underlying the felony murder charge, it is a lesser-included offense and requires vacatur.

A court reviews a trial court's decision regarding instructions and verdict forms using an abuse of discretion standard. *People v. Jones*, 175 Ill. 2d 126, 131-32, 676 N.E.2d 646, 649 (1997). A jury is required to return a general verdict on every offense charged. 725 ILCS 5/115-4(j) (West 2004). A jury instruction conveys the correct principles of law applicable to the evidence. *People v. Harris*, 225 Ill. 2d 1, 43, 866 N.E.2d 162, 187 (2007). It is the trial court's duty to give an instruction or verdict form when enough evidence warrants it. *People v. Smith*, 372 Ill. App. 3d 762, 767, 866 N.E.2d 1192, 1196 (2007).

Here, defendant was charged with six counts of first degree murder based on three theories: intentional murder (720 ILCS 5/9-1(a)(1) (West 2004)), knowing murder (720 ILCS 5/9-1(a)(2) (West 2004)), and felony murder (720 ILCS 5/9-1(a)(3) (West 2004)). Each theory has different elements for the State to prove. For intentional murder, the State must demonstrate that defendant intended to kill or do great bodily harm to Johns or that he knew that his acts would cause Johns' death. See 720 ILCS 5/9-1(a)(1) (West 2004). For knowing murder, the State must show that defendant had knowledge that his acts created "a strong probability of death or great bodily harm" to Johns. 720 ILCS 5/9-1(a)(2) (West 2004). Therefore, the difference between intentional and knowing murder is the requisite mental state. For felony murder, the State need not prove that defendant intended to kill or knew that his acts created a strong probability of killing Johns. *People v. Causey*, 341 Ill. App. 3d 759, 769, 793 N.E.2d 169, 178 (2003). Instead, the State must prove that defendant intended to commit the predicate

forcible felony–here, armed robbery–and, in committing that felony, unlawfully caused Johns' death. See 720 ILCS 5/9-1(a)(3) (West 2004).

Here, the jury returned a general verdict of guilty on the murder counts. When a general verdict is returned in a case where a defendant is charged with multiple counts of an offense based on different theories, the defendant is guilty of each count to which proof is applicable and sentence is imposed on the most serious offense. *People v. Cardona*, 158 Ill. 2d 403, 411, 634 N.E.2d 720, 723 (1994). Defendant was sentenced here on the knowing murder conviction, a more culpable state of mind for murder, as well as being sentenced on the jury's finding of fact and the armed robbery conviction.

Defendant, however, argues that had he been found guilty of felony murder predicated on the armed robbery and not guilty on the intentional and knowing murder counts, the resulting sentence would be reduced by 20 years. Defendant's argument is based on the concept that armed robbery is the predicate felony for the felony murder counts and as such, it is a lesser-included offense of felony murder that cannot support a separate conviction and sentence. *People v. Coady*, 156 Ill. 2d 531, 537, 622 N.E.2d 798, 801 (1993). Logically then, defendant could not be sentenced on his armed robbery conviction if the jury would have found him guilty of felony murder.

The State counters that separate instructions and verdict forms were unnecessary for two reasons. First, the State argues that the evidence was sufficient for the jury to convict him of intentional or knowing murder. Second, the State, citing *People v. Travis*, 170 Ill. App. 3d 873, 525 N.E.2d 1137 (1988), for support, argues that a defendant is not entitled to a separate jury instruction or verdict form for the various forms of murder.

We find our recent decision in *Smith* to be particularly instructive. In *Smith*, a jury convicted the defendant of first degree murder, armed robbery, and attempted armed robbery. *Smith*, 372 Ill. App. 3d at 763, 866 N.E.2d at 1193. As a result, the defendant was sentenced to consecutive terms of 60 years' imprisonment for murder, and 8 years' imprisonment for attempted armed robbery, with a concurrent 20-year term for the armed robbery. *Smith*, 372 Ill. App. 3d at 763, 866 N.E.2d at 1193. The defendant had been indicted with four counts of first degree murder based on three theories: intentional murder, knowing murder, and two counts of felony murder predicated on armed robbery and attempted armed robbery. *Smith*, 372 Ill. App. 3d at 763, 866 N.E.2d at 1193. After evidence was presented, the defendant requested a separate verdict form for felony murder, but the trial court denied the defendant's request and the jury was given general verdict forms for first degree murder, armed robbery and attempted armed robbery. *Smith*, 372 Ill. App. 3d at 765, 866 N.E.2d at 1194-95.

On appeal, we affirmed the convictions but modified the defendant's consecutive eight-year sentence for attempted armed robbery to run concurrent with his sentences for first degree murder and armed robbery. *Smith*, 372 Ill. App. 3d at 772, 866 N.E.2d at 1200. First, we recognized that if the defendant had been convicted of felony murder predicated on attempted armed robbery, attempted armed robbery would be a lesser-included offense that could not support a separate conviction and sentence. *Smith*, 372 Ill. App. 3d at 768-69, 866 N.E.2d at 1197. The State in *Smith* argued, as it has here, that according to *Travis* and *People v. Diaz*, 244 Ill. App. 3d 268, 614 N.E.2d 268 (1993), the defendant's argument had no merit.

In *Travis*, a jury instruction allowed the defendant to be convicted of murder as a principal or under an accountability theory based on three different mental states or by

committing one of three felonies. *Travis*, 170 Ill. App. 3d at 882-83, 525 N.E.2d at 1142. The defendant argued that the instruction denied him his right to a unanimous jury verdict because it does not require the jury to be unanimous on every element but only on the verdict in general. *Travis*, 170 Ill. App. 3d at 890, 525 N.E.2d at 1147. The court rejected the defendant's assertion, concluding that the jury "need only be unanimous with respect to the ultimate question of defendant's guilt or innocence of the crime charged, and unanimity is not required concerning alternative ways in which the crime can be committed." *Travis*, 170 Ill. App. 3d at 890, 525 N.E.2d at 1147.

In *Diaz*, the trial court instructed the jury that it could find defendant guilty of aggravated battery if it found that he inflicted great bodily harm to the victim or caused bodily harm while using a deadly weapon. *Diaz*, 244 Ill. App. 3d at 270, 614 N.E.2d at 270. The court, citing to *Schad v. Arizona*, 501 U.S. 624, 115 L. Ed. 2d 555, 111 S. Ct. 2491 (1991), found nothing unconstitutional with a jury instruction providing for alternative bases on which the jury could convict the defendant. *Diaz*, 244 Ill. App. 3d at 272-73, 614 N.E.2d at 271-72.

We found *Travis* and *Diaz* distinguishable. In both cases, the verdicts had no impact on the length of the defendants' sentences. *Smith*, 372 Ill. App. 3d at 770, 866 N.E.2d at 1198. Furthermore, neither case involved a defendant who had preserved the issue for appeal. *Smith*, 372 Ill. App. 3d at 770, 866 N.E.2d at 1199. Lastly, neither case involved the issue of whether the trial court erred in denying the defendant's request for separate verdict forms. *Smith*, 372 Ill. App. 3d at 770, 866 N.E.2d at 1199.

We determined that separate verdict forms would have allowed the jury to decide whether the defendant was guilty of intentional, knowing, or felony murder. *Smith*, 372 Ill. App.

3d at 771, 866 N.E.2d at 1199. If he was guilty of only felony murder, then he would have been ineligible to be sentenced to consecutive sentences. Therefore, we held that "when a defendant who is charged with intentional or knowing murder and felony murder requests a separate verdict form for felony murder and such a request has a basis in evidence *** the separate verdict form must be given or consecutive sentences cannot be imposed based on the offense underlying the felony murder." *Smith*, 372 Ill. App. 3d at 771-72, 866 N.E.2d at 1199-1200.

We find this reasoned conclusion persuasive and based on the analogous factual circumstances, apply the principles enunciated in *Smith* to this case. Here, the jury could have convicted defendant of felony murder but acquitted him of intentional and knowing murder. In such a scenario, the trial court would have been unable to sentence him to a consecutive sentence of 20 years for armed robbery. See 730 ILCS 5/5-8-4(a) (West 2004). Defendant asked the trial court to instruct the jury on felony murder and submit separate verdict forms. However, the trial court chose not to include separate instructions and verdict forms for felony murder. As a result, we do not know whether the jury found defendant guilty of felony murder, intentional murder, or knowing murder.

Thus, based on the foregoing principles and the trial court's declination to submit the requested verdict forms to the jury, we modify defendant's consecutive 20-year sentence for armed robbery to run concurrently with his sentence of 50 years for first degree murder and 25 years based on the jury's finding that the defendant used a firearm during the commission of the offense that was a proximate cause of Johns' death. 134 Ill. 2d R. 615(b)(4).

III. Defendant's Sentence

Lastly, defendant argues that the trial court's sentence was excessive because it failed to adequately consider his potential for rehabilitation. The State counters that the trial court properly considered the factors in aggravation and mitigation before imposing the sentence.

While the trial court is vested with wide discretion in imposing a sentence, its discretion is not absolute. 134 Ill. 2d R. 615(b)(4). However, a trial court's sentence will not be reversed absent an abuse of discretion. *People v. Hauschild*, 226 Ill. 2d 63, 90, 871 N.E.2d 1, 16 (2007). Our supreme court has opined that "a sentence within statutory limits will be deemed excessive and the result of an abuse of discretion *** where the sentence is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *People v. Stacey*, 193 Ill. 2d 203, 210, 737 N.E.2d 626, 630 (2000).

The Illinois Constitution requires the trial court to balance the seriousness of the offense against the likelihood of restoring the offender to useful citizenship. *People v. Quintana*, 332 Ill. App. 3d 96, 109, 772 N.E.2d 833, 846 (2002); Ill. Const. 1970, art. I, §11. In determining an appropriate sentence, a trial court must consider all factors in aggravation and mitigation, including defendant's age, mental ability, credibility, demeanor, moral character, social environment, and habits. *People v. Thomas*, 171 Ill. 2d 207, 227, 664 N.E.2d 76, 87 (1996). Where mitigating evidence is before the trial court, as it was here, it must be presumed that the trial court considered the evidence absent some indication otherwise. *People v. Willis*, 210 Ill. App. 3d 379, 389, 569 N.E.2d 113, 119 (1991).

Our review of the record convinces us that the trial court properly considered the evidence in mitigation and aggravation, the attorneys' arguments, and the presentence investigation report (PSI). The trial court heard that defendant was only 21 years old when he

committed this crime, did not have a violent background, and received numerous letters in mitigation from family and friends attesting to defendant's goodness.

However, the trial court also considered the seriousness of the crime. The trial court noted that based on medical evidence, Johns likely suffered blunt trauma to his head, indicating that defendant struck him on the head before he died. Defendant had four prior felony convictions, including a four-year prison term for failing to complete his adult probation term satisfactorily. The Adult Probation Department reported that defendant failed to cooperate completely in the preparation of the PSI. In addition, the trial court noted the heinous nature of the crime, where the medical evidence demonstrated that defendant shot Johns from a distance no farther than two feet away, and the fact that defendant admitted that he went to the store before 9 a.m., left, and came back to complete the crime.

It is apparent the trial court considered all relevant factors in aggravation and mitigation before handing down the sentences. The sentencing range for murder is between 20 and 60 years. 730 ILCS 5/5-8-1(a)(1)(a) (West 2004). But if during the commission of the offense the offender discharges a firearm "that proximately caused great bodily harm, permanent disability, permanent disfigurement, or death" to another, the trial court can add 25 years to a natural life term to the sentence. 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2004). For a Class X felony, which armed robbery is pursuant to Section 18-2 of the Criminal Code of 1966 (720 ILCS 5/18-2 (West 2004)), the trial court may sentence defendant to a term of between 6 and 30 years' imprisonment. 730 ILCS 5/5-8-1(a)(3) (West 2004).

Thus, the trial court's imposition of a 50-year term for murder, 25-year enhancement based on the jury's finding that defendant personally discharged a weapon during the offense,

and 20-year term for armed robbery all fall within the sentencing range for the respective offenses. Because the sentences fall within the sentencing range, an abuse of discretion is found only where the sentence is at variance with the spirit of the law or disproportionate to the offense. Based on the foregoing discussion, we do not find that the sentences are disproportionate to the offense. Therefore, we conclude that the trial court did not abuse its discretion in imposing the sentences at issue.

CONCLUSION

Based on the foregoing discussion, we determine that the trial court's error in instructing the jury on IPI Criminal 4th No. 3.15 with the "ors" between the factors was harmless. Further, we rule that the trial court abused its discretion by failing to submit separate verdict forms for felony murder to the jury, which necessitates us to modify defendant's 20-year sentence for armed robbery to run concurrently, rather than consecutively, to defendant's other sentences. Finally, we conclude that the trial court did not abuse its discretion in sentencing defendant to concurrent terms of 50 years' imprisonment for murder, enhanced another 25 years based on the jury's special factual finding, and 20 years' imprisonment for armed robbery.

Affirmed; sentence modified.

FITZGERALD SMITH, P.J., and O'MARA FROSSARD, J., concur.

1-06-1263