THIRD DIVISION
October 27, 2010

No. 1-08-3502

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Cook County. |
| | ) | |
| | ) | No. 02 CR 3413 |
| | ) | |
| DEVIN REED, | ) | Honorable |
| | ) | Dennis J. Porter, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE STEELE delivered the opinion of the court:

This appeal arises from defendant Devin Reed's convictions for first degree murder, armed robbery, and residential burglary following a jury trial.[1] Defendant was sentenced to concurrent prison terms of natural life, 60 years, and 15 years, respectively. On appeal, defendant contends that: (1) the trial court erred by denying his request to provide the jury with separate instructions and verdict forms for felony murder, which resulted in him receiving an improper sentence on the predicate felonies; (2) the trial court erred when it sentenced him to extended-term sentences for both first degree murder and armed robbery as extended-term sentences may only be imposed on the conviction of the most serious offense; (3) the evidence was insufficient to prove him guilty beyond a reasonable doubt of residential burglary where he was invited into the victim's home; (4) the trial court abused its discretion in sentencing him to natural life imprisonment for first degree murder because this was his first conviction for a

---

[1]Codefendants India Williams and Anthony Williams were tried in separate trials and are not parties to this appeal.

1-08-3502

violent offense and he had minimal involvement in the events that resulted in the victim's death; and (5) the trial court erred in refusing to allow defense counsel's proposed addict instruction where it was an accurate statement of the law and one of the State's witnesses was an admitted drug addict. For the following reasons, we affirm in part and reverse in part.

BACKGROUND

On January 1, 2002, shortly after midnight, defendant was standing in front of an apartment building in the 1500 block of South Karlov Avenue in Chicago. Defendant saw the victim, Timothy Kollar, sitting in a van in front of the building. Kollar told him that he was looking for India Williams,[2] and defendant replied that she was inside, smoking cocaine, and that Kollar needed to leave because the "spot was hot" and he "didn't want to bring more heat to it."

Approximately an hour later, Kollar returned, again looking for India. This time, Anthony Williams was standing outside with defendant and Anthony started "talking crazy" to Kollar. Both defendant and Anthony told Kollar to leave and to "catch up" with India later. After Kollar left, defendant and Anthony went inside to the basement apartment where India was and the three of them smoked cocaine together. As dawn approached, they left the apartment and drove around the neighborhood in Anthony's car. India told defendant and Anthony that she wanted to go to Kollar's house because "he [was] an easy trick." They then proceeded to Kollar's home. On the way to Kollar's house, they saw Kimberly Thompson[3] standing near a car wash on 16th street, and she joined them.

---

[2]India Williams was a prostitute.

[3]Kimberly Thompson was also a prostitute.

-2-

1-08-3502

When they arrived at Kollar's home near 25th Street and Kildare Avenue, he let them inside and went upstairs with India while defendant, Anthony and Thompson stayed downstairs. A short time later, Kollar called them upstairs and everyone smoked cocaine together. When the drugs ran out, Kollar gave India money and told her to leave to get more. India and Anthony left, and subsequently returned with more cocaine. Kollar complained about the quality of the drugs and sent India out again for more. Defendant, India and Anthony then left to purchase more drugs. On their way back to Kollar's house, they decided that India would try to rob Kollar while performing oral sex on him. They also decided that if the plan was unsuccessful, they would "knock [Kollar] out" and rob him.

Upon returning to Kollar's house, they went to a second-floor bedroom where everyone smoked cocaine for awhile before India and Kollar went into another bedroom. Thompson went into the bathroom, and shortly thereafter, India and Kollar joined her in the bathroom. When the three exited the bathroom, they returned to the bedroom. India gave Anthony and defendant some cocaine and told them to go downstairs.

Thompson, Anthony and defendant went downstairs, where Anthony and defendant began looking for objects they could steal. Defendant and Anthony found some guitars in cases and began playing with them. Kollar came downstairs, took the guitars from them, and put them away before returning upstairs. Thompson told defendant and Anthony that she needed to make a phone call, so she left the house. Approximately 20 minutes later, India called defendant and Anthony upstairs. Defendant picked up a porcelain statue and wrapped it in foam before giving

it to Anthony to carry upstairs.[4] When they arrived in the bedroom, Kollar and India were smoking cocaine with their backs to the door. India looked at defendant and nodded. Anthony then handed defendant the statue. Defendant struck Kollar on the right side of the head with the statue. Kollar fell back on the bed, looked at defendant, and said "why did you do that? Let's party, let's smoke some cocaine." Anthony then grabbed an aluminum baseball bat and hit Kollar two to three times while defendant searched the bedroom for money. India unsuccessfully attempted to tie Kollar with duct tape, but she then found an electrical cord, which she used to tie his legs. India then hit Kollar a few times on his legs with the baseball bat, after which Anthony again hit Kollar a few times with the bat.

Defendant subsequently left the bedroom and went downstairs. As he walked downstairs, he heard the metal bat strike Kollar several times. Once downstairs, defendant grabbed the guitar cases and put them by the door. He went outside and moved Anthony's car closer to the door. When Anthony and India subsequently came downstairs, Anthony tried to steal the television, but it would not fit in the car. By this time, Thompson returned to get more drugs and saw defendant, India and Anthony taking things from Kollar's house. Defendant and Anthony left in Anthony's car, while Thompson and India followed in Kollar's van. Defendant and Anthony lost track of India and Thompson for a short time, but subsequently located them near Jackson Boulevard and Kilbourn Avenue. When defendant yelled at India for not sharing the money she took from Kollar's house, India gave him $40 and drove off in Kollar's van.

---

[4]According to his statement, defendant wrapped the statue in foam so "it wouldn't hurt Tim too badly."

Defendant and Anthony then went to the home of Anthony's cousin, Yvonne Harris, and gave her a wooden guitar without strings before leaving. They then went to several pawn shops on Chicago's West Side in an attempt to sell the guitars they took from Kollar's house, but were unsuccessful. Finally, defendant and Anthony were able to sell the guitars at a gas station for $80, which they split.

Later that evening, defendant and Anthony were at a restaurant when they saw India in the parking lot sitting in Kollar's van with another woman. Anthony approached India and yelled at her. He then made the other woman leave the van, took the keys from India, and drove off with defendant following in Anthony's car. The three went to an apartment, where Anthony yelled at India and demanded the rest of the money. India told him that she took it to her mother's house and the three then went to her mother's house. India entered the house while defendant and Anthony waited outside. Shortly thereafter, India's boyfriend came outside and told them to leave. Anthony and defendant returned to the apartment at 15th Street and Karlov Avenue.

Meanwhile, Michael Enriquez, Kollar's nephew-in-law, was trying to reach Kollar because he did not show as expected for a New Year's gathering. At approximately 9:30 p.m. on January 2, 2002, Enriquez went to Kollar's home and found the front door open with only the screen door closed. Enriquez entered the house and saw Kollar face down on the floor next to the bed in an upstairs bedroom. There was a bat on the bed. Enriquez shook Kollar, but Kollar did not move. Enriquez subsequently called the police.

When the police arrived, they found Kollar's partially naked body in a second-floor bedroom. Kollar's hands were tied behind his back with duct tape and an electrical cord. The

cord was also wrapped around his legs and a piece of duct tape was wrapped around Kollar's neck and mouth. His body was bloody, swollen and bruised, with a pool of blood around his head and a dusty shoe print on the back of Kollar's shirt. The mattress was bloodstained and a blood-stained aluminum bat and utility knife were lying on top of it. When Kollar's body was moved, a piece of foam wrapped in duct tape was found underneath, along with several pieces of a broken statue. Two crack pipes were also found in the room.

Medical examiner Dr. Michelle Jordan testified concerning the autopsy. Kollar's injuries included a broken nose and facial fractures, swelling and bruising of the face, and skull fractures. Lacerations to his head implied blunt force injury and were consistent with being hit by a baseball bat. There were multiple skull fractures underlying the lacerations. Dr. Jordan identified photographs showing bleeding in the brain, bruising of the brain, and swelling of the brain. Dr. Jordan described a sharp force injury to the neck as a slitting of the neck. Additionally, there were hemorrhages in the throat muscles and a fracture of the hyoid bone, indicating strangulation. According to Dr. Jordan, Kollar died of cranial cerebral injuries due to blunt force trauma with strangulation a significant contributing factor to death. Dr. Jordan characterized his death as tortuous based on the extent of the injuries, the degree of bondage and the wound to the neck. Additionally, toxicology tests revealed that Kollar had a blood alcohol level of .03 and tested positive for one of the highest levels of cocaine Dr. Jordan had ever seen.

Thompson, who testified at trial on behalf of the State, indicated that she was a prostitute in January 2002 and admitted that she was a drug addict and spent all of her money on drugs. She had difficulty identifying defendant as one of the men she was with at Kollar's house. She

stated that she had memory problems as a result of her past addictions and because of her bipolar disease, which made the events she testified to fuzzy. The day after she left defendant, India and Anthony, Thompson saw on the news that Kollar had been killed. She called the police. She subsequently met with officers and identified the three defendants; India from a photograph and defendant and Devin in a lineup on January 6, 2002.

At the instructions conference, defense counsel offered an alternate version of Illinois Pattern Jury Instructions, Criminal, No. 1.02 (4th ed. 2000) (hereinafter IPI Criminal 4th) with additional language that the jury "could consider the evidence that a witness was addicted to drugs at the time of the crime in judging that witness' credibility." The trial court refused this version of IPI Criminal 4th No. 1.02.

Defendant then objected to the verdict forms and requested that the jury be given separate verdict forms for felony murder and intentional or knowing murder. The court denied defendant's request.

The jury returned guilty verdicts for first degree murder, armed robbery and residential burglary. The jury also found that the armed robbery was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty.

Defendant filed two *pro se* posttrial motions, one for a new trial and one for new counsel. Both motions were denied by the court. Defendant then waived a jury for sentencing purposes. The trial court found that he was eligible for the death penalty.

In aggravation, the State argued that defendant was a chronic law breaker, a 12-time convicted felon, a danger to the community, and on parole at the time of the offense. The State further argued that defendant "started the ball rolling" by hitting Kollar first.

1-08-3502

In mitigation, defense counsel argued that none of defendant's prior convictions were for violent crimes, that he came from a bad family environment, and that he wrapped the statue in foam prior to hitting Kollar.

The court stated that it was unusual for someone without a violent background to be facing the death penalty, but found that defendant had an "atrocious" criminal record. In mitigation, the court noted that defendant was arguably not present for the actual killing and did wrap the statue in foam so as not to hurt the victim too badly. The court then sentenced defendant to natural life imprisonment for felony murder, a concurrent extended-term sentence of 60 years for armed robbery, and a concurrent 15-year sentence for residential burglary. This timely appeal followed the denial of defendant's motion to reduce his sentence.

DISCUSSION

Defendant has raised five issues on appeal, namely: (1) whether the trial court erred by denying his request to provide the jury with separate instructions and verdict forms for felony murder, which resulted in him receiving an improper sentence on the predicate felonies; (2) whether the trial court erred when it sentenced him to extended-term sentences for both first degree murder and armed robbery as extended-term sentences may only be imposed on the conviction of the most serious offense; (3) whether the evidence was insufficient to prove him guilty beyond a reasonable doubt of residential burglary where he was invited into the victim's home; (4) whether the trial court abused its discretion in sentencing him to natural life imprisonment for first degree murder because this was his first conviction for a violent offense and he had minimal involvement in the events that resulted in the victim's death; and (5) whether the trial court erred in refusing to allow defense counsel's proposed addict instruction where it

-8-

1-08-3502

was an accurate statement of the law and one of the State's witnesses was an admitted drug addict.

## General Verdict Form

Defendant first contends that the trial court erred by denying his request to provide the jury with separate instructions and verdict forms for felony murder, which resulted in him receiving an improper sentence on the predicate felonies. The State concedes that under our supreme court's decision in People v. Smith, 233 Ill. 2d 1,10 (2009), the trial court should have granted defendant's request for separate verdict forms for the different theories of murder that he was charged with.

In Illinois, it is clear that, where a general murder verdict is delivered for a defendant who is charged with murder in multiple counts alleging intentional, knowing, and felony murder, the defendant is presumed to be convicted of the most serious of intentional murder, and judgment and sentence should be entered on that count. People v. Allen, 401 Ill. App. 3d 840, 856 (2010). However, a general verdict form cannot be presumed to be a finding of intentional murder when the trial court has refused a request for separate verdict forms that would have made the basis for the jury's findings clear. Smith, 233 Ill. 2d at 28; People v. Battle, 393 Ill. App. 3d 302, 314 (2009). Thus, our supreme court held that the appropriate remedy is to interpret the general verdict as a finding on felony murder. Smith, 233 Ill. 2d at 28; Battle, 393 Ill. App. 3d at 314. The supreme court then vacated the conviction and sentence in the underlying felony. Smith, 233 Ill. 2d at 29; Battle, 393 Ill. App. 3d at 314.

Here, as in Smith and Battle, defendant requested separate verdict forms for the separate theories of murder and that request was denied. Because the sentencing consequences differ

depending on the theory proven, the general verdict form did not provide the specificity necessary for the court to sentence defendant properly and, in light of Smith, must be interpreted as a finding of guilt on felony murder. See Battle, 393 Ill. App. 3d at 314; Allen, 401 Ill. App. 3d at 856. A defendant convicted of felony murder may not be convicted of the underlying felony. Smith, 233 Ill. 2d at 17; Battle, 393 Ill. App. 3d 314. In the instant case, defendant was charged with two counts of felony murder, one based on the predicate felony of armed robbery and one based on the predicate felony of residential burglary. In light of the foregoing analysis, we affirm defendant's conviction for murder, but reverse his convictions and sentences for residential burglary and armed robbery.

Our disposition of the preceding issue makes it unnecessary for us to consider defendant's issues concerning reasonable doubt of the residential burglary conviction and whether his sentence on the armed robbery conviction was proper.

Natural Life Sentence for Murder

Defendant next contends that the trial court abused its discretion in sentencing him to natural life imprisonment for first degree murder where this was his first conviction for a violent offense and he had minimal involvement in the events that resulted in Kollar's death.

A defendant is eligible for a sentence of death or natural life in prison if the defendant commits a murder in the course of a felony. 720 ILCS 5/9-1(b)(6) (West 2006). A trial court's determination that a defendant is eligible for a sentence of natural life will not be disturbed unless " 'the evidence is so unreasonable, improbable or unsatisfactory that it does not provide proof of the findings beyond a reasonable doubt.' " People v. Jackson, 304 Ill. App. 3d 883, 896-97 (1999) quoting People v. Gaines, 235 Ill. App. 3d 239, 250 (1992).

1-08-3502

Turning to the instant case, we find that defendant significantly understates his involvement in Kollar's death. Contrary to his assertions, he was part of the agreement to rob Kollar from the beginning. Defendant, along with India and Anthony, devised a plan to rob Kollar while India performed sex acts on him. He and Anthony started searching the first floor of Kollar's house for items to steal while India was upstairs with Kollar. Additionally, defendant grabbed a statue to hit Kollar with in order to steal from him. Defendant did in fact hit Kollar several times on the head with the statue. While Anthony hit Kollar with the baseball bat, defendant searched his room for money. Defendant gathered the items that they were stealing and moved Anthony's car closer to the door so it could be loaded. Defendant fled with his codefendants, and defendant split the proceeds of the robbery with his codefendants. While defendant is correct that he did wrap the statue in foam prior to hitting Kollar with it and he may not have delivered the fatal blow to Kollar, it is abundantly clear that he fully participated in the events that led to Kollar's death.

Defendant also ignores the fact that he was found eligible for the death penalty by the trial court based on the fact that during the course of another forcible felony, defendant inflicted injuries which at least in part contributed to Kollar's death, and defendant acted with the knowledge that his acts created a strong probability of death or great bodily harm. See 720 ILCS 5/9-1(b)(6) (West 2006). Thus, defendant was eligible for the death penalty. However, the court found mitigating factors persuasive and sentenced defendant to natural life imprisonment instead. See 730 ILCS 5/5-8-1(a)(1)(b) (West 2006). As such, defendant's contention is without merit and the trial court properly sentenced him to natural life imprisonment for felony murder.

Defendant's Proposed Jury Instruction

-11-

Finally, defendant contends that the trial court erred in refusing to allow defense counsel's proposed addict instruction where it was an accurate statement of the law and one of the State's witnesses was an admitted drug addict. Defendant sought to have the jury instructed on a modified version of IPI Criminal 4th No. 1.02. He argues that Thompson was the only eyewitness to testify at trial concerning the incidents surrounding Kollar's death and she admitted that she was a drug addict and was using drugs at the time. Defendant further argues that the trial court's refusal to issue the instruction denied him a fair trial.

A court reviews a trial court's decision regarding instructions using an abuse of discretion standard. Battle, 393 Ill. App. 3d at 313. A jury instruction conveys the correct principles of law applicable to the evidence. Battle, 393 Ill. App. 3d at 313. It is the court's duty to give an instruction when enough evidence warrants it. Battle, 393 Ill. App. 3d at 313.

Parties must be allowed to cross-examine witnesses about drug use, but a trial court is not required to instruct the jury on the unreliability of testimony by drug addicts. People v. Foster, 322 Ill. App. 3d 780, 788 (2000). It is the function of the jury, not the trial court, to determine the credibility of witnesses. Foster, 322 Ill. App. 3d at 788. The supreme court has held that it is not reversible error to deny an offered addict instruction where evidence of the addiction is before the jury so it can make its own determination of witness credibility. See People v. Steidl, 142 Ill. 2d 204, 238 (1991). Additionally, courts are reluctant to give a non-IPI drug addiction instruction because it places undue emphasis on particular evidence in a case. Foster, 322 Ill. App. 3d at 788.

In the present case, evidence of Thompson's drug use was before the jury. It was very clear that she, along with the victim, defendant and codefendants, had engaged in heavy drug use

on the day of Kollar's murder. Additional evidence was presented to the jury that Thompson had a past drug addiction and the effects of her addiction. Thompson was also subject to cross-examination. Defense counsel spoke about her drug addiction in closing argument. The trial court refused to tender the modified instruction, finding that IPI Criminal 4th No. 1.02 was sufficient to instruct the jury on issues of credibility. We conclude that the trial court properly denied defendant's request to have the jury instructed on a modified version of IPI Criminal 4th No. 1.02.

CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed in part and reversed in part.

Affirmed in part and reversed in part.

QUINN, P.J., and MURPHY, J., concur.

1-08-3502

| | |
|---|---|
| Please Use Following Form:<br><br>Complete TITLE of Case | THE PEOPLE OF THE STATE OF ILLINOIS,<br><br>                    Plaintiff-Appellee,<br><br>v.<br><br>DEVIN REED,<br><br>                    Defendant-Appellant. |
| Docket No.<br><br>COURT<br><br>Opinion Filed | No. 1-08-3502<br>Appellate Court of Illinois<br>First District, THIRD Division<br><br>October 27, 2010<br>(Give month, day and year) |
| JUSTICES | JUSTICE STEELE delivered the opinion of the court:<br><br>Quinn, P.J., and Murphy, J.,                          concur |
| APPEAL from the Circuit Ct. of Cook County, Chancery Div. | Lower Court and Trial Judge(s) in form indicated in the margin:<br>Circuit Ct. of Cook County, Criminal Div.<br>The Honorable   Dennis J. Porter  , Judge Presiding. |
| For APPELLANTS, John Doe, of Chicago.<br><br>For APPELLEES, Smith and Smith of Chicago, Joseph Brown, (of Counsel)<br><br>Also add attorneys for third-party appellants or appellees. | Indicate if attorney represents APPELLANTS or APPELLEES and include attorneys of counsel. Indicate the word NONE if not represented.<br><br>Attorney for **Defendant-Appellant**:   Michael J. Pelletier, State Appellate Defender, of Chicago, IL (Patricia Unsinn, Deputy Defender, and Therese Bissell, Assistant Appellant Defender (of Counsel))<br><br>Attorneys for **Plaintiff-Appellee:**   Anita Alvarez, Cook County State's Attorney, of Chicago, IL (Alan J. Spellberg, Annette Collins, and Tasha-Marie Kelly, Assistant State's Attorneys (of Counsel)) |